HOWARD *v.* STATE.

Opinion delivered July 2, 1904.

1. MISFEASANCE AND NONFEASANCE—VAGUENESS OF STATUTE.—Sand. & H. Dig. § 1753, providing that "if any clerk shall knowingly and willfully do any act contrary to the duties of his office, or shall knowingly and willfully fail to perform any act or duty required of him by law, he shall be deemed guilty of a misdemeanor in office, and upon conviction thereof shall be removed from office," is not invalid for vagueness. (Page 588.)

2. GRAND JURY—PRESUMPTION OF REGULARITY.—Where the record shows that a special grand jury found the indictment under which defendant was convicted, the presumption that such grand jury was properly

impaneled prevails, in the absence of any showing to the contrary in the record proper or in the bill of exceptions. (Page 589.)

3. MISFEASANCE—SUFFICIENCY OF INDICTMENT.—An indictment of a county clerk which alleges that he unlawfully, willfully and knowingly issued a certain county warrant, well knowing the same to be fraudulent, wrongful, illegal, not a just charge against said county, and contrary to the duties of his said office, substantially follows Sand. & H. Dig., § 1753, and is sufficient. (Page 591.)

4. INDICTMENT—CONSTRUCTION.—An indictment of a county clerk for misfeasance in fraudulently issuing a county warrant of a certain number "for the payment of thirty dollars to and in the name of" a certain person does not charge that the warrant was issued to such person, but that it was issued for the payment of the amount named to him. (Page 595.)

5. EVIDENCE OF INTENT—OTHER OFFENSES.—Where there is a question as to whether or not the crime charged was by accident or mistake, or intentional and with bad motive, the fact that such act was one of a series of similar acts committed by the defendant is admissible, because it tends to prove system and show design. (Page 596.)

Appeal from Mississippi Circuit Court.

ALLEN N. HUGHES, Judge.

W. D. Howard, county clerk of Mississippi county, was convicted of unlawfully issuing a county warrant, and has prosecuted an appeal. Affirmed.

*W. B. Flannigan, W. J. Lamb,* and *J. T. Coston,* for appellant.

The indictment was bad. 43 Tex. 525; 51 Ala. 25; 91 Ala. 16. It was improper to admit evidence of other offenses. 39 Ark. 279; 37 Ark. 262; 36 Am. St. 887; 15 Am. Rep. 428; 55 N. Y. 81; 30 Ala. 542; 1 Wyo. 78; 142 U. S. 450; 33 Mo. 524. Section 1753 of Sand. & H. Dig. is unconstitutional. 45 Ark. 164; 139 U. S. 288. Its meaning is indefinite. 158 U. S. 282; 134 U. S. 628. The county court represents the county. 26 Ark. 463; 98 Cal. 331; 46 Neb. 35; 66 Ala. 187; 103 Ala. 578; 92 Ill. 137. The county clerk is no part of it. 34 Kan. 273; 5 Kan. 213; 39 Ind. 373. Warrant No. 527 was never issued. 52 Kan. 528. The court's instructions were erroneous. 39 Fed. 408; 32 Ark. 610. To constitute the offense, there must have been a guilty intent. 34 Wis. 675; 96 U. S. 703.

*George W. Murphy, Attorney General,* for appellee.

The warrants were properly admitted in evidence. 1 Greenl. Ev. § 52. The indictment was good. Sand. & H. Dig. §§ 1238, 1241, 1250; 26 Ark. 261.

Wood, J. Appellant, who was the county clerk of Mississippi county, was indicted, convicted, and removed from office, under section 1753 of Sandels & Hill's Digest, which is as follows: "If any clerk shall knowingly and willfully do any act contrary to the duties of his office, or shall knowingly and willfully fail to perform any act or duty required of him by law, he shall be deemed guilty of a misdemeanor in office, and upon conviction thereof shall be removed from office."

The indictment, omitting merely formal parts, charged that appellant, "on the 2d day of December, 1903, being then and there county clerk, etc., did unlawfully, willfully and knowingly issue a county warrant, numbered 527, for the payment of $30 to and in the name of Ed Miller, then and there well knowing the same to be fraudulent, wrongful, illegal, not a just charge against said county and contrary to the duties of his said office."

1. It is contended that the statute is unconstitutional.

Section 27, art. 7, of the constitution is as follows: "The circuit court shall have jurisdiction, upon information, presentment, or indictment, to remove any county or township officer from office for incompetency, corruption, gross immorality, criminal conduct, malfeasance, misfeasance or nonfeasance in office." The statute under consideration does not inflict corporal punishment, or impose pecuniary mulcts. In this it differs from the ordinary criminal statute. Its design was to define the offense for which, and to declare the method by which, the incompetent and corrupt officer might be removed from office. See *Haskins v. State,* 47 Ark. 246. It is a practice act, in conformity with art. 7, § 27 of the constitution, applicable to clerks. We see nothing vague in the statute. The legislature simply meant to declare that it was a misdemeanor in office for any clerk to willfully do or fail to do any act contrary to the duties of his office, as required by law. A county clerk has few, if any, duties to perform that are not required by law. But if he has any such, certainly a willful failure to perform these would not work a

forfeiture of his office under this statute. It is the willful doing or failure to do any act contrary to the duties of his office as prescribed by law that will, upon conviction, work a forfeiture of office under this statute. The acts constituting the offense are thus defined by the law, and are not left, as in Ex parte *Jackson,* 45 Ark., 164, "to the moral idiosyncracies" of the court and jury.

The act of March 9, 1877, provides (sec. 1) that "Whenever any presentment or indictment shall be filed in any circuit court in this State against any county or township officer, for incompetency, corruption, gross immorality, criminal conduct amounting to a felony, malfeasance, misfeasance or nonfeasance in office, such circuit court shall immediately order that such officer be suspended from his office until such presentment or indictment shall be tried," etc. Sec. 2. "Upon conviction of any such officer for any such offenses, a part of the sentence of the circuit court having jurisdiction shall be to remove such officer from office," etc. This statute has to do with the suspension and removal of officers from office. It is couched in even more general terms than the one we are considering. This court in *Allen* v. *State,* 32 Ark. 241, passed upon the constitutionality of the above statute, and upheld it. By analogy, the decision is authority here. The statute under consideration must always be read in connection with the statute defining the particular duty alleged to have been violated.

2. The indictment was called in question by motion in arrest and by demurrer.

(*a.*) The motion to arrest alleged "that the grand jury that found the indictment was not summoned according to law, but was a special grand jury, summoned by the court without authority of law or justification to investigate an offense, which was neither committed nor discovered after the regular grand jury attending said court had been discharged." The record entries show that at the regular May term, 1904, of the Mississippi circuit court, the court ordered the sheriff "to summon sixteen men from the body of the county, to report at 1:30 o'clock this day as special grand jurors," and that the sheriff, pursuant to such order, returned the names "of sixteen good and lawful men and qualified electors of Mississippi county, as follows"

[names them], "and all being found competent, and sworn in by the court to serve as such grand jurors, were by the court charged as to their duties," etc.  Our statute provides: "If any offense be committed or discovered during the sitting of any court after the grand jury attending such court shall have been discharged, such court may, in its discretion, by an order to be entered in the minutes, direct the sheriff to summon a special grand ·jury," etc. Sand. & H. Dig. § 2066.  The appellant contends, upon the authority of this statute, that the indictment is void, because the special grand jury which found it was not selected as the statute prescribes.  He cites to support his contention cases from Texas, Alabama and Mississippi.  We have examined these, and find that they are based upon statutes which do not have the same provisions as ours.  They are authority, however, for the contention that the grand jury should be selected in the manner prescribed by law, and, unless so selected, its indictments are void.  This is the law, but appellant fails to show that the grand jury which returned the indictment against him was selected and impaneled contrary to the statute.  The record proper shows that a special grand jury was ordered, but it is silent as to the reason why it was ordered, and there is nothing in the bill of exceptions to show that the offense was discovered by the court before the regular panel was discharged.  The order of the court directing the sheriff to summon sixteen men from the body of the county to report as "special grand jurors" sufficiently indicates that the grand jury was not the regular panel selected as the law requires in chapter 93, Sandels & Hill's Digest.  But, for aught shown to the contrary, the grand jury finding this indictment may have been impaneled under section 4291, Sandels & Hill's Digest, which provides:  "If for any cause the jury commissioners shall not be appointed, or shall fail to select a grand or petit jury, as provided in this chapter, or the panel selected shall be set aside, or the jury lists returned in court shall be lost or destroyed, the court shall order the sheriff to summon a grand or petit jury of the proper number, who shall attend and perform the duties thereof, respectively, as if they had been regularly selected."  The trial court is presumed to have followed the law until the contrary is shown, and the contrary is not shown by the mere statement to that effect in appellant's motion to arrest.

(b.) The indictment follows substantially the language of the statutes in charging and describing the offense, and is therefore sufficient on demurrer.

3. Appellant further contends:

(1.) That warrant No. 527 was not issued.

(2.) That, if issued, it was not done willfully.

(3.) That, if issued, it was not "to and in the name of Ed Miller," as charged in the indictment, but to himself, and that, therefore, there is a fatal variance, and the charge of the court is erroneous.

(4.) That the court erred in admitting evidence of other offenses.

For a proper determination of these contentions, it is necessary to consider the law in regard to the issuance of county warrants and the facts developed on the trial. Section 1238 of Sandels & Hill's Digest is as follows: "Whenever any allowance shall be made by the county court, and an order therefor entered upon the records, the clerk shall, when requested by the person in whose favor such allowance has been made, issue a warrant for the amount of such allowance," etc. Section 1241 reads: "No person shall be allowed to receive from the clerk any warrant on the treasurer of the county until such person has, by himself, his agent, or attorney, receipted for the same to the clerk, which receipt shall be by the clerk preserved, and laid before the county court, at its next meeting, for its inspection." The evidence on behalf of the state tended to show that appellant became clerk of the county court on the 31st day of October, 1900. The county judge had the names of the paupers of the county placed on a list in a book which was kept by the clerk of the county, and the clerk put the amount of each pauper's claim opposite his or her name on the list, and the county court made the allowance to each pauper according to this list. It appears that the county court made the orders of allowance without requiring the claims to be verified. The county judge depended upon the county clerk to "keep the list right," and made the allowance according to "the list handed him by the clerk." Hundreds of dollars were allowed in this way—from $300 to $500 each quarter. At one time the list showed claims amounting to $700, which was allowed as stated above. As

early as March, 1902 or 1903, it is uncertain which, Ed Miller
was on the pauper list. The witness Nelson Tolliver says that
he took Ed Miller to his house March 1, 1902, and that on the
31st day of March he died. He notified the county judge of
Miller's death the next day after it occurred. Tolliver was allowed
and paid $10 in county scrip for keeping Miller till he died. But,
notwithstanding Miller's death, it appears that allowances con-
tinued thereafter to be made to him by the county court till the
amount was $180. Tolliver, who was an illiterate negro, received
a letter from appellant in November or December, 1903, and in
response called at appellant's office, and appellant asked him if
Ed Miller did not die at his house, and he told appellant that he
did. Appellant then told Tolliver that more time was due Ed
Miller. Tolliver asked how much, and appellant told his deputy,
one Lasley, to go to the records and see what was due Nelson
Tolliver for keeping Ed Miller. The records, it appears, were
in another apartment across the hall, and the appellant followed
his deputy into the hall, and told him to put the amount on a
piece of paper, and hand it to him. The deputy ascertained the
amount to be $180, put it on a piece of paper, and handed it to
appellant as requested. Appellant then called his deputy into
the hall, told him that Ed Miller was dead, and that they could
buy the scrip for $5 or $10. Upon returning to the office, appel-
lant told Tolliver there were $6 or $8 due him, for which he would
give him $5. Tolliver accepted the $5 and left. Tolliver did not
give appellant any authority to sign his name to the receipt book.
The evidence tends to show that the next day after Tolliver left,
the scrip was issued in six pieces of $30 each. The stubs of scrip
book, numbered 525, 526, 527, 528, 529 and 530, were in appel-
lant's handwriting, and show that the warrants were payable
to Ed Miller, and the receipts in the stub book show that the
name of "Nelse Tolliver" was signed by appellant. A claim of
$30 for keeping Ed Miller was allowed by the county court July
6, 1903. This was the amount for which warrant 527 was issued.

The testimony of appellant for himself shows that he wrote
out the warrants, including No. 527, in the name of Ed Miller,
and that Nelse Tolliver authorized him to sign his name to the
stub. That was on the day Nelse Tolliver came into the office

to see about the scrip for Ed Miller. After filling out the warrants, and before delivering them to Tolliver, he asked Tolliver where Ed Miller was, and, on being informed by Tolliver that Ed Miller was dead, he refused to deliver the warrants to Tolliver, but put the same with the other warrants (Gatling scrip) in an envelope to itself, and placed it in the Bank of Osceola. He kept his own scrip in Mr. Brickey's store, and kept this Ed Miller scrip separate from his own, in order that he might hold it for the county. After refusing to let Tolliver have the scrip, Tolliver said he was very sorry; that he was needing some money; and from the way he talked appellant was satisfied that there was a balance due Tolliver of $7 or $8. Tolliver then said that if he could get $5 it would be all right, and appellant let Tolliver have the $5, and kept the warrants, depositing them in the Bank of Osceola. Appellant denies telling Lasley to look up the records; denies telling him to put the amount of scrip on a piece of paper; says that he loaned Tolliver $5 until the judge could see about it. He never attempted to get the $5 back from Tolliver. Told the county judge at the April term of the court that he thought he ought to have his $5 back. The reason he did not bring the matter before the judge at the January term of the court was that he had forgotten where he had put the scrip. The scrip was destroyed by the county court on the 11th of April, 1904. The above is substantially the testimony *pro* and *con* concerning the issuing of warrant No. 527.

Appellant asked instructions declaring that the order of the county court allowing the claim of $30 for keeping Ed Miller by Nelson Tolliver authorized the county clerk to issue warrant numbered 527 for that amount, and requesting the court to tell the jury to find appellant not guilty unless they found from the evidence beyond a reasonable doubt that the county clerk, at the time he issued warrant 527, knew that Ed Miller's death occurred before the 6th day of July, 1903, the day on which the account for keeping Ed Miller was allowed. The court refused appellant's request, as asked, over his objection, but gave the following:

"You are instructed that, even if you find that at the time said warrant No. 527 was issued, the defendant knew that Ed Miller was dead, you must further find from the evidence beyond

a reasonable doubt that he knew that Ed Miller's death occurred prior to the time the claim was allowed, which was on the 6th day of July, 1903; and unless you do so find, your verdict will be for the defendant.

"Filling out the warrant, that is, writing it, signing it, and putting the seal on it, does not constitute an offense; and, no matter what the defendant's motives were up to the time he wrote out the warrant, signed it and put his seal on it, if you find from the evidence that he did not deliver it to any one, nor appropriate it to his own use, but held it for the purpose of turning it over to the county to be destroyed, as he claims he did, he committed no offense, and your verdict will be 'not guilty.'

"The defendant is presumed to be innocent until his guilt is established, and the burden of proof is on the state to prove his guilt to your satisfaction beyond a reasonable doubt; and unless you find from the evidence that his guilt has been proved beyond a reasonable doubt, you will find the defendant 'not guilty.'

"If at the time the defendant issued the warrant in question he knew that Ed Miller was dead when the allowance was made, and nothing was due from the county to him or any one on his account, and if, knowing all this, he issued it in such a manner as to amount to an issuance to himself, and he did this with fraudulent intent, he is guilty. If the defendant did not know that Ed Miller was dead until after the warrants issued; if he refused to deliver them, but held them for the county, and did not purchase them, he is not guilty."

The question as to whether or not the warrant No. 527 was issued by delivery was thus fairly and fully submitted to the jury, and, however much we might be disposed to differ with the jury, there was ample evidence to justify the conclusion that the warrant was issued by delivery to appellant himself; that he paid Tolliver the $5 and issued the scrip for his own benefit. The evidence also warrants the conclusion that the scrip was issued willfully. The testimony for the state tends to show that the scrip was not issued until the next day after Tolliver was in the office, and after appellant had been advised of Ed Miller's death. True, appellant in his testimony vehemently denies this. But the credibility of the witnesses was for the jury.

The appellant himself said the reason why he did not deliver the scrip to Tolliver was that Tolliver had told him of Ed Miller's death; showing, taking his statement as true, that he must have known that there was something wrong about the allowance of the claim to Ed Miller, and that he could not lawfully issue the scrip; and yet, if the testimony of Lasley be true, we find appellant suggesting that the scrip could be bought for a small amount, and asking him (Lasley) how it might be receipted for, and then issuing the warrants, and taking them himself, and filling out the stubs and the receipts, signing Tolliver's name to the receipts "per order."

The record here shows that on the 6th day of July, 1903, "a claim for three months at $10 per month was allowed Ed Miller." The claim being allowed to "Ed Miller," the clerk could only issue the warrant at the request of Ed Miller. Sec. 1238, *supra.* And, if Ed Miller were dead, he could not make the request, and Tolliver could not do so for him. The dead man could have no agent or attorney, and there was no one therefore authorized to sign the receipt for him. Sec. 1241, *supra.* This the clerk must have known. It appears that the charge of the court to the effect that it must be shown that appellant knew that the death of Ed Miller occurred prior to the allowance of the claim before his guilt could be established was far more favorable to appellant than he had any right to expect; for, if appellant knew that Ed Miller, to whom the claim had been allowed, was dead at the time he issued the warrants, then he must have known that his act in issuing the scrip under the circumstances was illegal.

We find no variance between the indictment and the proof. Appellant is charged with "unlawfully, willfully and knowingly" issuing a county warrant. The words, "numbered 527 for the payment of $30 to and in the name of Ed Miller," are merely descriptive of the warrant that was issued. The charge, as we view it, is not that he issued the warrant to Ed Miller, but that he issued a warrant "for the payment of $30 to Ed Miller," thus describing the warrant, but without alleging to whom it was issued. The gravamen of the charge is the willfully issuing, contrary to law, a certain warrant. It was not necessary to allege to whom the warrant was issued.

This brings us, in conclusion, to the contention that the court erred in permitting evidence of other offenses. The court permitted evidence to go before the jury showing that one John Gatlin was once a pauper upon Mississippi county; that during Gatlin's life his wife had been disposing of the scrip allowed him; that Gatlin died on November 12, 1902; that after his death Mrs. Gatlin never sold, disposed of, or authorized any one to draw any scrip from the county. An affidavit to a claim against the county for a pauper's coffin for John Gatlin was permitted to go before the jury, and the order of the county court at January term, 1903, allowing the claim, scrip numbered 535. The court permitted the record of the county court showing the allowance to John Gatlin, and the stub books showing stubs of warrants numbered 536, 537, 538 and 539 for such allowance, to be introduced. The court permitted one Leston to testify that he wrote to appellant to send him $100 worth of Mississippi county scrip, sending appellant a check, and that appellant in reply sent him by mail county warrants numbered 531, 532, 533 and 534, which he used in the payment of taxes. The warrants, so numbered, were introduced in evidence. The court permitted the following letters, after proper identification, to be read as evidence:

"OSCEOLA, ARK., December 2, 1903.

"Mr. W. H. Henning, Caruthersville, Mo.:

Dear Sir—There is a small piece scrip due you for keeping one pauper by the name of Gracen Lillard. I can sell it for you if you will send me an order, as it will soon be outlawed and you will lose it. Let me hear from you. Yours truly,

"W D. HOWARD,
"County Clerk."

"Mr. W. H. Henning, Caruthersville, Mo.;

"Dear Sir—Your letter to hand some days ago, and in reply will say that I can get some $17 or $18 for what is due you. Let me know at once before this man backs out. Yours truly,

"W. D. HOWARD,
"County Clerk."

"OSCEOLA, ARK., April 8, 1904.

"Mr. W. H. Henning, Caruthersville, Mo.:

"Dear Sir—I sold the balance of your scrip two or three weeks ago, and would have sent you the money sooner, but have been very busy in the election. Out of the $96 I had got $81.60, and I sent you $17.50, making a total of $99.10. My charges for attending to this matter for you is $9.91; deducting this $9.91 and the $17.50, balance due you of $71.60, for which find my personal check for same. As you will remember, I told you I sold the scrip for you as you were in Missouri, and could not handle it as you told me in your letter. Yours truly,

"W. D. HOWARD."

Witness Henning further testified as follows: "Gracen Lillard was a colored man. He stayed with me, and left this town with me in 1896, and went to Barfield, and stayed up there with me about three years. He is the same man who was a pauper here. His son-in-law heard that he was a pauper, and took him to St. Louis, and I reported to Mr. Charlie Driver. I answered Mr. Howard's letter, and told him, if there was anything due me, to sell it, and send me the money. He sent me $17.50 by registered mail. When I received the letter of April 8, 1904, it had a check for $71.69 in it. I was not expecting such a check from him. I accepted the $17.50 in payment of all demands, and this check came like a Christmas gift."

The record shows that when the prosecuting attorney announced in his opening statement that he would offer evidence of similar offenses to that charged in the indictment, the appellant objected, and the court announced that the evidence would be allowed to go to the jury only for the purpose of showing the intent. The appellant excepted to the ruling of the court in permitting all of the above testimony to go before the jury.

In their excellent brief, counsel for appellant contend that the testimony was irrelevant. But, if mistaken in this, they insist that it was not shown when the Gatlin scrip was issued, nor was it shown that defendant (appellant) knew Gatlin was dead until after the scrip was issued. Nor was it shown that appellant knew that Lillard had left the state. Hence appellant contends that no proper foundation was laid for the introduction of the evidence.

No rule of criminal procedure is better established, perhaps, than that evidence of one crime shall not be permitted in proof of another. Even where offenses are alike, evidence of one is not, generally speaking, competent to prove the other. "To permit such evidence," says Mr. Bishop, "would be to put a man's whole life in issue on the charge of a single wrongful act; and crush him by irrelevant matter which he could not be prepared to meet." Mr. Wharton declares that it is a violation of the fundamental sanctions of our law to admit evidence that the defendant committed one offense in order to prove he committed another. Wharton, Cr. Ev. § 48. But whatever tends directly to prove a man guilty of the crime charged, though it shows him also guilty of another crime, may be given in evidence against him. 1 Bishop, New Cr. Pro. § 1123; Clark, Cr. Pro. p. 517. Where guilty knowledge or intent is an essential ingredient of the offense charged, evidence which has a direct bearing on such knowledge or intent, or which tends to establish it, is admissible, although apparently collateral and foreign to the main subject. 1 Greenleaf, Ev. § 53; 1 Bishop, Cr. Pro. § 1126; Clark, New Cr. Pro. p. 518; Wharton, Cr. Ev. § § 31-46.

When there is a question as to whether or not the crime charged was by accident or mistake, or intentional and with bad motive, the fact that such act was one of a series of similar acts committed by the defendant is admissible, because it tends to prove system and show design. Clark, Cr. Pro. 517; Wharton, Cr. Ev. (8th Ed.) § § 31-46. But it must be remembered always that such evidence is admissible only for the purpose of showing particular intention, knowledge, good or bad faith, when these are in issue, and essential to constitute the crime. It is never admitted to show that the defendant was likely to commit the crime for which he is being tried. Clark, New Cr. Pro. 518; *State* v. *Kelly,* 36 Am. St. Rep. 887. A familiar example of the application of the doctrine recognized by nearly all the text writers on the subject is in the charge of uttering a forged instrument or coin, knowing same to be forged. "In passing forgeries of coin or paper, and other like transactions, where a crime is committed only when done with the knowledge that the thing put off is false, a multiplicity of instances, either identical

or similar, or the possession of other like counterfeits or forgeries, more or less distinctly implies knowledge, and is admissible in evidence against the defendant." 1 Bishop, New Cr. Pro. § 1126, sub. 2; Clark, Cr. Pro. 518.

A party "is charged with holding or circulating forged paper or other documents, as to which it is important to prove his *scienter*. One of such papers he may hold without being justly chargeable with knowledge of its character; when three or four are traced to him, suspicion thickens; if fifteen or twenty are shown to have been in his possession at different times, then the improbability of innocence on his part is in proportion to the improbability that the papers could have been in his possession without his knowing their true character.". Wharton, Cr. Ev. § § 34, 39. See cases cited.

"In an indictment for knowingly uttering a forged document, or a counterfeit bank note, proof of the possession, or of the prior subsequent utterance, of other false documents or notes, though of a different description, is admitted as material to the questions of guilty knowledge or intent." 1 Greenleaf, Ev. § 53. See numerous cases cited in note, and in Bishop, New Cr. Pro., Clark's Cr. Pro. and Wharton Cr. Ev. at pages cited *supra*.

The learned trial judge.had a very clear apprehension of the correct rule for the admissibility of such evidence. The most difficult question we have had to determine in the case is whether or not he made proper application of it to the facts. We have finally reached the conclusion that the John Gatlin and Gracen Lillard scrip transactions were proper to go before the jury. The county judge made allowances to paupers upon a list furnished by the clerk, and expected the clerk "to keep the list right." The clerk himself said that the county judge asked him "to look up the paupers." Appellant was the clerk when Gatlin died, and when the claim for his coffin was made and allowed before the county court. He was the custodian of the papers, and the claim necessarily was filed with him; yet allowances were made for John Gatlin after his death, and the clerk issued and had in his possession the warrants for these allowances. There was evidence to warrant the conclusion that he must have known that such allowance, in the first place, was illegal, and then that

no scrip could legally issue to a dead man; that no one could request its issuance under the statute, and no one could receipt for it. We think all this is clearly inferable from the evidence concerning the John Gatlin scrip. Likewise, the appellant must have known that Gracen Lillard was dead or (what is equivalent) beyond the jurisdiction of the court; for the evidence shows that he was taken to Missouri in 1896; that on the clerk's record of scrip allowance, opposite the entry, was marked "Off the list." The appellant himself wrote to Henning, who it appears had charge of the pauper Lillard, at Caruthersville, Mo. The letters to Henning, we think, indicate clearly that appellant must have known at least that Gracen Lillard and his keeper were in Missouri, and, if so, the county court, of course, had no jurisdiction to allow warrants for Gracen Lillard. And the appellant could not legally issue scrip for such allowance when there was no one authorized to request it, or to receipt for it. So, the question being whether or not appellant issued warrant number 527 intentionally, and with guilty knowledge, or willfully, the fact that he had issued many other county warrants under similar circumstances in the name of paupers who were dead or beyond the jurisdiction of the court, tends strongly to show a system in that respect, and design and guilty knowledge in the case on trial. And such evidence is admissible just as proof of the possession, or of the prior or subsequent utterance of other false and forged documents is admissible in cases of forgery or uttering forged instruments, according to the authorities before cited.

Finding no error, the judgment is affirmed.