JOHNSON *v.* STATE.

Opinion delivered May 27, 1905.

1.   LARCENY—FRAUDULENT BET.—When persons conspire to cheat a man under color of a bet, and he simply deposits his money as a stake with one of them, not meaning thereby to part with the ownership therein, they commit larceny by taking the money, though they are afterward by fraud made to appear to win; but if he bet his money, intending to part with its ownership, the taking of it, so fraudulently acquired, would not constitute larceny.   (Page 432.)

2. SAME—CONSENT THAT STAKEHOLDER KEEP MONEY.—The question whether persons who conspired to cheat a man under color of a bet on a foot race were guilty of larceny in obtaining his money will depend upon whether in depositing his money with the stakeholder the man intended to part with his money, and will not be affected by his subsequent consent that the stakeholder should keep the money until the race should be run over. (Page 433.)

3. EVIDENCE—OTHER CRIMES.—While the general rule is that one crime cannot be proved as tending to prove another, yet when the question of intention in the performance of an act becomes material, then proof of similar acts which tends to show the intent with which such act was committed is admissible. (Page 433.)

4. SAME—SUBSEQUENT CRIME.—Where proof of a series of acts is admissible to show the intent with which a particular act was committed, part of the occurrences may have been subsequent to the one charged. (Page 533.)

5. APPEAL—AFFIRMATIVE SHOWING OF ERROR.—Under the rule which requires an affirmative showing of error to call for reversal, a cause will be reversed for the admission of evidence, if the record fails to show whether the evidence was brought out by the appellant or the appellee. (Page 434.)

Appeal from Saline Circuit Court.

ALEXANDER M. DUFFIE, Judge.

Affirmed.

*Wood & Henderson,* for appellant.

Appellant was not guilty of larceny. 2 Bish. Cr. Law, § 758; 3 Green. Ev. § § 150, 160; 18 Am. Eng. Enc. Law, 459; Russell, Crimes, 200; 45 N. Y. 392. Where the property is voluntarily parted with, there is no larceny. 17 Ill. 399; 2 Phila. 385; 94 N. Y. 90; 23 N. Y. 61; 53 N. Y. 11; 13 Atl. 422; 25 L. R. A. 346; 43 Pac. 2; 2 Q. B. 312; 59 Pac. 593; 36 Pa. 506; 22 So. 378; 49 Ark. 147; 87 S. W. 836; 178 Pa. St. 23. The evidence of Cobb as to the circumstances of a race run a month after the Doucette race was inadmissible. Under. Cr. Ev. 107, 584; 20 Ark. 225; 32 Ark. 220; 45 Ark. 132; 59 Ark. 422; 52 Ark. 516; 50 Ark. 287; 39 Ark. 278, 626; 2 Ark. 242; 4 Ark. 59; 81 S. W. 450; 61 N. E. 293.

*Robert L. Rogers, Attorney General,* for appellee.

Appellant was guilty of larceny. 2 Bish. Cr. Pro. § 813; 2 Bish. Cr. L. 824; 6 T. B. Mon. (Ky.) 130; 1 Den. 120; 11 Q. B. 920; 1 Den. Cr. Cases, 584. Where possession is fraudulently obtained in pursuance of an intent formed at the time, it is larceny. 25 Ia. 561; 76 Ia. 85; 56 Mich. 548. This was a question for the jury to determine. 49 La. Ann. 1337. Proof of other offenses based upon the same general plan or scheme are admissible to show intent. 11 Am. & Eng. Enc. Law, 514; Under. Cr. Ev. 111; 99 Pa. St. 388; 82 Wis. 580.

HILL, C. J. The appellant was indicted by the grand jury of Garland County for the crime of larceny, and on change of venue was convicted in Saline County, and sentenced to four years in the penitentiary, and has appealed.

About 1902 a party of men, known by various names, among others the "Buckfoot Gang," were operating in various parts of the country. Their scheme was to have a foot race between two well-advertised runners. One of them was to be the favorite runner of a club of millionaires who were given to sports of all kinds. The other was comparatively unknown, but very swift and known to the club racer to be swifter than he. The club racer and the club manager, privately learning the situation and the impending fate of the club favorite, were anxious to make money out of such race, and would approach some one who had ready cash and good credit at home who would be willing to aid them, and incidentally himself, in making money out of the "sure thing." In this light it was presented to the intended victim. The party inveigled was not to bet his own money; he was merely to back the runner against the club runner with money furnished by the schemers, and bet the money the schemers furnished him. He was expected to have plenty of money in sight and good references as to his credit at home to satisfy the millionaires that he was in their class. In varying details these plans were worked at Webb City, Mo.; Salt Lake City, Utah; Aurora, Mo., and Hot Springs, Ark. In some cases it was known to the inveigled party that the club runner was going to lose the race, irrespective of speed, and in others he rested on his certain information that his man was the fastest.

The inveigled party was always induced in some way to put up his own money, with an understanding that it was to be returned, and not really bet.  Probably this was not difficult in the closing hours before the race, when the stakes were high and the excitement growing, and his belief that the result was a "sure thing."  The "sure winner" had an unfortunate way of falling, while well in the lead, and the club runner would first reach the goal.  To appease the disappointed and chagrined victim, and, seemingly, his friends who bet on the loser, an opportunity would be given to run the race over, giving the fallen runner's friends time to go home and repair their fortunes, and increase the purse which was to be held intaet until the race was run over.

In this case Johnson decoyed one Doucette, a lumberman from Texas, in the scheme for a race at Hot Springs.  Doucette had formerly been proprietor of four or five saloons in different Texas towns, and over each of his saloons had been run a public gambling hall, not in connection with the saloon, he says, but incidentally located there.  Notwithstanding Doucette's intimacy with gamblers, he was unsophisticated in the hands of the "Buckfoot Gang."  It was represented to him that Eddie Morris was swifter than Harry Price, the latter the runner of the millionaires' club; that Harry knew it, and that a race could be arranged, and all that was needed was a man of his credit and cash to follow directions.  He was assured by both Morris and Price, before he left Texas, that Morris was the fastest.  He arranged his affairs, and came to Hot Springs with $8,300 ready to impress the millionaires, and extolled the swiftness of the runner, who came, he said, from his lumber camps.  The arrangements were carried out.  He met the millionaire clubmen, whose castles were evidently in Spain, and they put up $2,500 as forfeit for Price, and he, with money furnished, put up the like amount for Morris; the stakes were to be $5,000 on a side, making the purse $10,000, which was finally arranged substantially as agreed.  He was furnished with large sums to bet by Price and one Thompson, the manager of the club and, was what was more important in this transaction, the stakeholder.  These sums were equally divided between appellant and Doucette, and they laid the bets with the millionaires.

Many thousands of dollars were bet in this way. Doucette bet $100 of his own, and the stakeholder privately returned it to him, and gave color to the theory that the bets on his side were feigned for the purpose of inducing the millionaires to put up their money. In the last hour of the betting Doucette parted with his $8,300. The witnesses for appellant claim he bet to win or lose, but he gives a different version of it.

The material parts of his testimony here given are taken from appellant's abstract. "Johnson and I then went to the bank, and drew $8,000 in one package. * * * I put my money in my pocket, and Johnson and I started back to the clubroom, and I said to Johnson, 'I don't believe I will go any further with this,' and he said, 'Everything is all right; come on,' and so went on to the clubroom, and they wanted to bet right away. I went into the back room, and Eddie Morris and Johnson followed me, and Eddie Morris opened his coat and said, "There is your money, you bet that money you got out of the bank, so as to show these people it is good money, got out of the bank in blocks, and you will get your money back. So I went in and bet the $8,000. Mr. Johnson had a very fine diamond stud, and he bet that. I also bet two $100 bills that I still had. By that time the hacks were ready to start to the race." He says further: "I did not understand that I was to put up my $8,000, because Eddie Morris said he would give it back; that he had it in his coat pocket, and wanted me to bet my money because it was new money that came out of the bank in blocks, and the money he had in his pocket was supposed to be the referee's money. It was not my intention to put up my own money. I supposed I was to get about 25 per cent. of the winnings to pay me for my trip." Again, he says, after reiterating the substance of the above: "I considered that the money he had was mine, and I was betting his money. I never intended that any of my money should be staked on the race. I did not intend to part with my money."

Doucette found "that the race is not to the swift, nor the battle to the strong," for his runner, while nobly leading, fell. He says that he denounced the scheme, and demanded his money, but was laughed at, and the attitude of one of the party, with a pistol, as he thought, convinced him that his wisest course was

to say no more about it then.  The appellant's witnesses say that he agreed to let the money stay with the stakeholder until he and Johnson went home to raise more money to add to the purse, and have the race run over again within thirty days.

The State introduced witnesses who attended similar performances at Webb City, Mo.; Salt Lake City, Utah, and Aurora, Mo., and who were the several victims of those races.  The same general plan and scheme was worked as in this one, and some of the participants, while varying at the different races, were the same parties as those at Hot Springs; the appellant always present and participating.

The schemers appeared in different roles in the cast, and frequent changes of names occurred, probably to fit the new role.  The last race in evidence was at Aurora, Mo., the week following the one at Hot Springs.  This seems to have been the "run off" of the Utah race, for Mr. Cobb's benefit, Mr. Cobb being the Doucette of that transaction.  Three questions arise.

1.  Does the State's evidence prove larceny?  One of this party has been introduced to this court before, and he obtained a reversal of a conviction of larceny, and the law controlling such cases was then announced, and this laid down as the rule: "Where persons conspire to cheat a man under color of a bet, and he simply deposits his money as a stake with one of them, not meaning thereby to part with the ownership therein, they, by taking the money, commit larceny, and not the less so though afterward they are by fraud made to appear to win."  (Citing authority.)  *Hindman* v. *State,* 72 Ark. 516.  The court carefully limited a conviction upon finding the facts within this rule.  Doucette's testimony, if true, brings the case within the rule and the instructions.

The appellant's witnesses claimed Doucette bet his money on the result of the race, and the court instructed that, if Doucette bet his money to win or lose, even though pursuant to a conspiracy inducing him to do so by false representations, yet that would not be larceny, and they must acquit.  The jury were fully instructed that no matter how fraudulent or dishonest the inducements may have been, yet, if Doucette bet his money, intending to part with its title and possession, the taking of it,

so fraudulently acquired, would not constitute larceny. The appellant's rights were fully protected in these instructions.

2. It is insisted that Doucette consented, after the race, to the stakeholder keeping the money awaiting the race to be run over. The court instructed the jury that, unless they found defendant guilty under other instructions, such arrangement would prevent the taking of the money being larceny. In other words, if the crime was consummated under the law as above explained before such arrangement, then the consent would not change it; but if such consent was procured before the consummation of the crime, if it was a matter of false inducement up to that point, then the consent would prevent it being larceny. This is all that appellant could ask on this score, and that question has gone to the jury on conflicting evidence, and is at rest.

3. Was the evidence of similar acts by these conspirators admissible? The general rule, of course, is that one crime cannot be proved as tending to prove another; but when the question of intention in the performance of acts becomes material, then similar acts which tend to show whether an innocent or criminal intent is present becomes admissible. This is frequent in cases of uttering forged instruments, passing counterfeit coins, receiving stolen property, and is applied in larceny as well as other crimes. 1 Wigmore, Evidence, § 346. The question was recently considered in this court, and this rule announced: "When there is a question as to whether or not the crime charged was by accident or mistake, or intentional and with bad motive, the fact that such act was one of a series of similar acts committed by the defendant is admissible, because it tends to prove system and show design." *Howard* v. *State,* 72 Ark. 586. This case illustrates the wisdom of the rule.

One of these races was run just after the one now before the court, and objection is made to it also on the ground that it was of subsequent conduct. This class of evidence is admissible alone as reflecting light on the intent, and it matters not what part of the series the one in question happens to be. The authorities seem uniform that when the system is admitted part of the occurrences may be subsequent to the one charged. 1

Wigmore, Evidence, § § 346, 316; Wharton's Crim. Ev. § 35.

The court is of opinion that every right of the appellant has been carefully guarded, and that he has had a fair and impartial trial.

Judgment affirmed.

ON REHEARING.

Opinion delivered June 17, 1905.

HILL, C. J.   The appellant files a motion for rehearing, and again calls attention to two alleged errors assigned in his original brief, which were not mentioned in the opinion of the court.

1:  Just before Doucette put up his money, Johnson bet his diamonds, and this was brought out in evidence. While Harry Price was on the stand, the prosecuting attorney in cross-examining him asked him where Johnson got the diamonds.  He proved by him that Johnson bought the diamond ring from Ryan, and Ryan bought it from Boatright (two other members of the "Buckfoot Gang"), and that it had been won from one Willard, whom Johnson had brought to another foot race.  This is the objectionable testimony, but counsel overlooked the fact that on their objection to it the court instructed the jury that it was incompetent.

2.  The next point is that  the State was permitted in rebuttal to call Doucette and elicit the following testimony:

"Q.  One of the witnesses, in testifying about your reputation, has testified about your killing a man.  Did you ever kill anybody down there?"  A.  No, sir."  A similar question and answer about robbing a sister were permitted.  Appellant asserts this testimony is contrary to the rule in *Hollingsworth* v. *State,* 53 Ark. 387.  The record does not show the testimony of these impeaching witnesses.  It merely shows that the defendant introduced depositions of witnesses to the effect that the reputation of Doucette (also of Cobb) for truth and morality was bad.  There is nothing to show whether the defendant or the State brought out these specific charges, or the connection in which they were made.

If the defendant had brought out these charges, clearly he could not complain that they were rebutted, and they might have been elicited by the State under circumstances rendering rebuttal proper, or the State might have been precluded from rebutting its own testimony. In the state of the record the court cannot presume error. On the contrary, all presumptions are in favor of the court's ruling, and it requires an affirmative, showing of error to call for a reversal, not a mere showing that under some circumstances this might have been error.

The motion for rehearing is denied.