## FLEMING v. THE STATE OF INDIANA.

[No. 21,582. Filed May 24, 1910.]

1. LARCENY.—By Trick.—Bogus Wrestling Match.—Evidence.— Evidence that defendant and others conspired to induce the prosecuting witness to bet and lose money to them on a bogus wrestling match sustains a judgment convicting them of larceny. p. 273.

2. LARCENY.—Bunko-Steering.—Election.—Where defendant's acts render him liable to a prosecution for either larceny or bunko-steering, a prosecution under one statute constitutes a bar to a prosecution under the other. p. 274.

3. LARCENY.—Bunko-Steering.—Penalties.— Election.— Defendant in a larceny case has no right to complain because the State elected to prosecute for larceny instead of bunko-steering, a conviction for either being justified by the evidence, where the punishment for larceny is less than for bunko-steering. p. 275.

From St. Joseph Superior Court; Vernon W. VanFleet, Judge.

Prosecution by The State of Indiana against William Fleming. From a judgment of conviction, defendant appeals. Affirmed.

Anderson, Parker & Crabill and S. J. Crumpacker, for appellant.

James Bingham, Attorney-General, A. G. Cavins, E M. White and W. H. Thompson, for the State.

JORDAN, J.—Appellant was prosecuted and convicted in the lower court upon an indictment containing two counts. The first charged that on the — day of April, 1908, in the

county of St. Joseph, State of Indiana, Charles E. Foster, John Barnes, John Hughes, John Murphy, William Blair, George Wilson and William Fleming (appellant herein) did then and there unlawfully, knowingly and feloniously, unite, conspire, confederate, etc., for the object and purpose, and with the unlawful and felonious intent, then and there unlawfully, and feloniously to take, steal and carry away $10,000 in money of the personal goods and chattels of William J. Springborn. The second count is based upon §2269 Burns 1908, Acts 1905 p. 584, §377, being the grand larceny statute. It alleges that Charles E. Foster, John Barnes, John Hughes, John Murphy, William Blair, George Wilson and William Fleming ''did then and there unlawfully and feloniously take, steal and carry away $10,000 in money, of the value then and there of $10,000, of the personal goods and chattels of William J. Springborn.'' Section 2269, *supra,* defines grand larceny as follows: ''Whoever feloniously steals, takes and carries, leads or drives away the personal goods of another, of the value of $25 or upwards, is guilty of grand larceny, and, on conviction, shall be imprisoned in the state prison not less than one year nor more than fourteen years, fined not exceeding double the value of the goods stolen, and disfranchised and rendered incapable of holding any office of trust or profit for any determinate period.''

The statute defining what is termed ''bunko-steering'' (§2471 Burns 1908, Acts 1905 p. 584, §562) reads as follows: ''Whoever allures, entices or persuades another to any place upon any pretense, and then and there, by fraud or duress, induces or compels such person to lose, advance or loan money, to part with anything of value, or to execute his check, note, or other obligation either for money or for anything of value; or whoever, in like manner, allures, entices, or persuades another to any place and then and there induces or compels him to part with anything of value by means of any trick, device or artifice, or upon any game or wager, is

guilty of bunko-steering, and, on conviction, shall be imprisoned in the state prison not less than two years nor more than fourteen years; and all persons present at such place at such time, engaged therein, shall be prosecuted, tried and punished for such offense as principals.''

There was a trial by jury and a verdict returned finding appellant guilty of grand larceny, as charged in the indictment, and that he was over thirty years old. Over his motion for a new trial, the court rendered judgment that he be imprisoned in the Indiana state prison for a period of not less than one year nor more than fourteen years, and that he pay a fine to the State in the sum of $1.

It is insisted by appellant's counsel that under the facts in this case the prosecution should have been under the statute defining ''bunko-steering,'' and that the conviction of appellant for larceny cannot be upheld. They concede that were it not for the ''bunko-steering'' statute he, under the evidence, would be guilty of larceny. The following is a summary of the evidence given on the trial by William J. Springborn, the prosecuting witness: He resides at Cleveland, Ohio, and was a member of the board of public service. He first met Fleming (appellant) in 1906, in a business way. In March, 1908, Fleming sent a man to see him, bearing the information that if he could raise $10,000 there was a land deal in South Bend, Indiana, wherein he could make some money. This informant stated that he had a friend who knew all about the particulars. Soon after this, appellant came to see Springborn in Cleveland, Ohio, and informed him that he and his nephew, William Blair, were associated with four or five wealthy men connected with the United States Steel Company at Gary, Indiana. He further stated to Springborn that these men owned a tract of 2,600 acres of land in Louisiana, which they had purchased as a hunting resort, but that a son of one of these gentlemen had died while at this resort, and the owners had come to the conclusion that the land was too swampy for a health resort,

and they had authorized appellant's nephew, William Blair, to sell this land very cheap—for $4 per acre. The land had been previously drained by a government ditch, but this fact was unknown to the owners thereof. Blair could sell the land through some Chicago broker at a very much higher price, and he wanted the money to buy the land. Appellant stated that his nephew had written to him for the money, under the impression that appellant was still quite wealthy, as he had formerly been, but he said that he had met with reverses and lost his money, and therefore was compelled to ask some one to furnish the amount—$10,240. He would, in return, divide the profits with the person who furnished the money. Fleming and Springborn talked the matter over at Cleveland, and talked about an abstract of title to the land, and it was finally arranged between them that the transfer of the land should be made to Blair, because Springborn did not want to guarantee the title as he knew nothing about the land. It was finally arranged between appellant and Springborn that they would go to South Bend, Indiana, on the following Tuesday, provided Springborn could secure the money. The latter drew from the bank $300, and borrowed $10,000, and having secured this money he and appellant came to South Bend as arranged. On the way to the latter place appellant informed Springborn that he had arranged with Blair, his nephew, to take the transfer of the property and divide the profits; that since the ditch had been constructed the land had very much increased in value; that his nephew had not been treated well by his associates, that he was a hard worker, and one who had been underpaid, that he had to do the dirty work of his employers, the owners of the land, and that he felt justified in not informing them that the land had increased in value since they had instructed him to sell it at $4 per acre.

On arriving at South Bend, Springborn was introduced by appellant to William Blair, the nephew, who was informed by appellant that Springborn was the man that had

come with him from Cleveland, and that he had the money to purchase the real estate. Appellant stated that Mr. Pomeroy, the largest holder of the land, would come from Chicago the next morning, and then they would talk over the matter with him. Springborn informed appellant that he wished to deposit his money in some bank for the night, and they went to a bank in South Bend where Springborn deposited $10,270. The next morning Blair met appellant and Springborn in the lobby of the Oliver hotel, where Springborn had registered as a guest, and produced a telegram which purported to be from Pomeroy, and which stated that Pomeroy had been called to Colorado, and could not reach South Bend for a few days. Springborn stated to appellant that while he was in South Bend he might as well see the other owners of the property and talk the matter over with them, and offered to go to their offices, which appellant said they had in that city, but Blair and appellant told him these men usually came to the Oliver hotel for lunch, and when they did come they would bring them to Springborn's room. Before this, on the same morning, appellant told Springborn that his nephew had another transaction out of which he hoped to make considerable money. When Blair came to the hotel, he asked appellant if he had spoken to Springborn about the matter. The latter said that he had only mentioned it to him. Blair then explained that the men who owned the land in question were of a "sporty" disposition; that they had with them a valet by the name of Murphy, who was a wrestler, and that they often arranged wrestling matches in which Murphy took part, and nearly always came out victorious, the landowners betting heavily on him, and that they made considerable money in this manner; that he (Blair) was well acquainted with Murphy, and that he was thinking of arranging a wrestling match for Murphy, upon the outcome of which he (Blair) and Murphy could bet, and thus win some money.

It was further stated that since they must wait for Pome-

roy they might have a wrestling match in the interim. Springborn said that he had witnessed some wrestling matches.   Fleming said: "Why I know all about them," and then said to Springborn: "If you will just stay and help us in the arrangement and act as clerk or recorder for us, why, we will take care of the rest." Blair said that he knew of a young wrestler not very far from South Bend, and that he would arrange for a match between him and Murphy.  Blair told Springborn that if the landowners said anything to him about a wrestling match he was not to discourage it, but allow it to proceed, and assist him and Fleming to make whatever arrangements were necessary.

After lunch they went to their rooms, and Blair brought in three men, whom he introduced to Springborn as Colonel Hughes, Mr. Foster, and Mr. Barnes.  Blair explained to them that Fleming and Springborn were the men who had come from Cleveland for the purpose of purchasing the club house land in Louisiana, that they were ready to proceed with the transaction, but on account of the absence of Pomeroy the papers could not properly be made out at that time, as he was the largest owner of the property.  Springborn asked some questions regarding the property, and especially about the abstract.   The owners referred him to Blair for an answer.  Hughes asked him if he was going to Chicago, and when he said he was, the former asked him if he intended to go to the wrestling match.  Some conversation was had between Hughes and Blair about a wrestling match which was about to come off in Chicago, and Hughes asked Blair in respect to his judgment as to the result of the match. Blair, it appears, put his hand on Hughes's shoulder and said to him: "Take my advice, and do not bet on that match. That is a difficult match, and it is hard to say who is going to win it.  It, in my judgment, is likely to go either way, and you are up to lose your money."  The wrestling match in which Murphy (the valet) was to be one of the wrestlers was suggested.  This suggestion was acquiesced in by the re-

puted landowners, and Blair was instructed by them to complete the arrangements.

Appellant said that he knew a young fellow in Cleveland who was a good wrestler, who could be matched against Murphy. Hughes and Barnes then spoke up and said: "You are not putting up some professional against us? You understand that our man is only an amateur?" Appellant said that his man was an amateur and not a professional wrestler. Blair had instructed Springborn to say that he had seen this wrestler in Cleveland, and knew him and knew his weight. After this conversation it appears that Barnes and Foster left, saying that they would leave the details of the match to Blair to work out, for he was the man who understood the matter, and that they had perfect confidence in him. Blair then said: "Now, I will be busy in getting Wilson over here from Saint Joseph. He is over here at Saint Joseph, Michigan, and he will come here if he can, and you say he is from Cleveland; you want to call particular attention to his fine points." Wilson was the wrestler of whom Fleming had previously spoken as having known in Cleveland.

Wilson, the supposed wrestler of whom Blair had spoken, appeared and was introduced to Springborn. Rules to govern the wrestling match which was being arranged were drawn up in the absence of Springborn, supposedly by Blair, and were then signed by Blair, appellant and Springborn. Springborn was coached concerning the betting. He was selected to bet the money of Blair and appellant on Wilson against the money put up by Hughes, Foster and Barnes on Murphy, and to keep a record of the betting. This it appears Springborn did under the directions of both sides, he being supplied with money after a recess was had. After the recess the betting was resumed, and Springborn was directed to go to the bank for a fresh supply of money in event he should run short, and while on the way to the bank Wilson, the wrestler, would meet him and give him a

roll of money. Springborn went out and drew his money from the bank and put up the amount of $10,000 on the Wilson side of the match. After the money was put up, Blair, it appears, upon a pretext that there was error in the figures in regard to the money, got hold of the money and carried it from the room where the men were, saying that he was going to place it in a bank. Springborn told Fleming that he had bet his $10,000, and asked him to tell Blair to give it back to him. Fleming said that he would do so. Blair and Foster soon returned and reported that they had placed the money in the vault of the American Trust Company.

Blair told Springborn that he had made arrangements for the match to take place at a park a little ways out in the country at a secluded spot, where no one would be any the wiser. The parties then proceeded to this park. On arriving at the park Springborn found Hughes, Murphy and Foster waiting in a large room. In a short time, after all arrangements were perfected, the wrestling match commenced. Wilson was the wrestler for the side which Springborn represented, and Murphy for the other side—that being the side of the landowners—and Fleming was the referee. After wrestling for a few minutes, Wilson won the first fall. The wrestlers then rested for a short time, during which they were rubbed with some kind of liniment, and they again commenced to wrestle. The second round was quite short, Murphy threw Wilson to the mat on the ground, and fell heavily upon him. Some kind of fluid which looked like blood, which had been prepared for the occasion, ran from Wilson's mouth, and the latter writhed and twitched and pretended to be unconscious, and every one present appeared to be very much excited and rushed to his assistance.

Springborn suggested to Blair that they telephone for a doctor, and Blair said he would go for a doctor, and told Springborn that he would see him at a certain hotel men-

tioned in Cleveland on the following day, and return the
money that appellant had put up. He then left, and Flem-
ing took Springborn by the arm and told him it was no
place for him, and started with him to the street-car. Spring-
born protested, and said it was cowardly to run away and
leave Wilson while he was so badly injured. Barnes came
up and told him that he would send his auto for Wilson,
and have him taken to some private sanatorium where he
would get along all right. Fleming and Springborn then
boarded a street-car and went to the hotel, took their grips,
paid their bills, went to the depot, and departed for Cleve-
land.

Springborn expressed to Fleming his regrets over the en-
tire affair, and Fleming assured him that everything would
be all right; that Wilson was not seriously hurt; that Blair
was an honorable man, and that the money would be re-
turned to Springborn. Springborn testified that as the
train carrying him to Cleveland was passing the park
where the match had been held, he saw four men
coming out of the park whom he recognized as Hughes,
Foster, Murphy and Wilson, the latter being the supposed
injured wrestler. On Friday after returning to Cleveland,
Springborn went to the Hollenden hotel in search of Flem-
ing. Fleming was not there, but he found him at a saloon,
and asked him if he had heard anything from Blair. He
said he had not. Springborn then showed Fleming a tele-
gram which he had received from Murphy, in which it was
stated that Blair had the money, and would see Springborn
in Cleveland on Saturday, and that Wilson was still in bad
condition. The $10,000 was never returned to Springborn.

Upon appellant's return to Cleveland he stated to the
chief of police of that city that he had been the referee of
the wrestling match in question at South Bend, Indiana,
and that he could declare the match a draw and have all
the money returned, and that if allowed to go to South

Bend he could secure Springborn's money. He claimed to the police that he did not know where Blair was at that time. After the close of the pretended wrestling match, as heretofore shown, in order to delay Springborn's demand for the money which had been taken from him, appellant assured the latter that Blair had the right to declare the match a draw, and that he would do so, and that Springborn's money would then be returned to him. The money in question was not returned to Springborn, but had been appropriated to the use of appellant and his confederates. It appears from the evidence that Springborn, by the transaction in question, did not intend to part with or devest himself of the ownership of his money. He only temporarily consented to part with the possession thereof.

There was evidence given by citizens of South Bend, who had long resided in that city, to show that Foster, Barnes, Hughes and Blair did not reside in South Bend, and that they had no offices in that city, as represented to Springborn by Fleming. There was also evidence which disclosed that Fleming and his confederates in crime had previously perpetrated their false schemes and tricks upon other victims, and thereby obtained and procured money from them. In all of these cases, like the case under consideration, Fleming appears to have been the principal actor. On the trial, no evidence was introduced on behalf of appellant.

Considering in its entirety the evidence in this case, of which we have presented but a mere summary, it may be said fully to establish that appellant and his

1. confederates united and conspired with the felonious intent to obtain Springborn's money by means of the tricks, artifices and schemes which the evidence shows they concocted. It appears that they successfully carried out their conspiracy, and by the tricks, artifices, schemes and contrivances in question they procured and obtained from Springborn at the county of St. Joseph, State of In-

Vol. 174—18

diana, in April, 1908, $10,000 of his money, having at the time they obtained it the felonious intent to appropriate it to their own use. That under the facts appellant was properly convicted of grand larceny, is well sustained by the authorities. See *Grunson* v. *State* (1883), 89 Ind. 533; *March* v. *State* (1889), 117 Ind. 547; *Fleming* v. *State* (1894), 136 Ind. 149; *Towns* v. *State* (1906), 167 Ind. 315, 119 Am. St. 501; *Hindman* v. *State* (1904), 72 Ark. 516, 81 S. W. 836; *Johnson* v. *State* (1905), 75 Ark. 427, 88 S. W. 905; *People* v. *Shaughnessy* (1895), 110 Cal. 598, 43 Pac. 2; *Miller & Smith* v. *Commonwealth* (1879), 78 Ky. 15, 39 Am. Rep. 194; *People* v. *Shaw* (1885), 57 Mich. 403, 24 N. W. 121, 58 Am. Rep. 372; *State* v. *Copeman* (1905), 186 Mo. 108, 84 S. W. 942; *State* v. *Ryan* (1905), 47 Ore. 338, 82 Pac. 703; 1 L. R. A. (N. S.) 862; *State* v. *Edwards* (1902), 51 W. Va. 220, 41 S. E. 429, 59 L. R. A. 465; 25 Cyc. 40-43.

The controlling question in this case is not whether appellant could have been convicted of "bunko-steering" under §2471, *supra,* but the proposition is, Was he, under the indictment and facts herein, properly convicted of grand larceny? That he was, in view of the authorities before cited, is beyond successful controversy.

Conceding, without deciding, that appellant might have been indicted and convicted of "bunko-steering" under §2471, *supra,* still, it would not necessarily follow

2. that the same facts would not sustain a conviction upon the charge of larceny. For, as affirmed in the case of *State* v. *Styner* (1900), 154 Ind. 131, "there are many acts that offend against more than one of our criminal statutes." Under such circumstances the State may elect under which statute it will proceed, and the conviction or acquittal of the accused will thereafter operate as a bar to a prosecution against him under the other statute. This rule is well supported by our decisions. *Hickey* v. *State* (1865), 23 Ind. 21; *Bonsall* v. *State* (1871), 35 Ind. 460; *Hamilton*

*v. State* (1871), 36 Ind. 280, 10 Am. Rep. 22; *Polson* v. *State* (1894), 137 Ind. 519; *Enlow* v. *State* (1900), 154 Ind. 664; *Williams* v. *State* (1907), 169 Ind. 384.

In the case of *Hickey* v. *State, supra,* defendant was indicted and convicted of grand larceny, but the proof went to show that he had committed robbery. It was urged that his conviction was erroneous. It, however, was sustained by this court, which held that the State had a right to elect to prosecute and convict him of larceny, though it thereby deprived itself of the right thereafter to prosecute the accused for robbery. In the case of *Hamilton* v. *State, supra,* defendant was indicted and convicted of assault and battery with intent to commit the crime of robbery. It was held in that appeal that an instruction requested by defendant, which advised the jury that if the evidence showed that defendant had carried out his intention by completing the crime of robbery, it ought to acquit him of the crime charged, was properly refused. The court in considering this ruling, in the course of its opinion, said: "It is sometimes the case that the same evidence would sustain a prosecution for the violation of any one of two or more statutes. * * * In such cases the State has the right to elect on which statute she will proceed, and it is not for the defendant to say that he shall not be punished under the statute on which the State has chosen to bring him to trial. In such cases the defendant cannot be twice punished for the same offense. Where the same facts will make out a case under either statute, and the State has elected under which she will proceed, and the defendant has been convicted or acquitted, this is a bar to a further prosecution." Citing authorities.

The period of imprisonment provided for a violation of the "bunko-steering" statute (§2471, *supra,*) is from two to fourteen years, while that fixed for the grand larceny

3. statute is for a period of from one to fourteen years. Hence appellant is not in a position to complain that

he was subjected to a greater penalty by being prosecuted for grand larceny than he would have been had the prosecution been for the crime of "bunco-steering" under §2471, *supra*.

Other authorities might be cited in support of the contention advanced by the State, that, under the facts, appellant was properly indicted and convicted of committing the crime of grand larceny, notwithstanding the provisions of the statute defining the crime of "bunko-steering." Under the evidence in this case we are satisfied that appellant and his confederates in crime are a consummate set of rogues and thieves, and that appellant's punishment is justly deserved.

Judgment affirmed.