## POPOVICH v. STATE OF INDIANA.

[No. 25,098. Filed August 25, 1931.]

*McMahon & Conroy,* for appellant.

*Arthur L. Gilliom,* Attorney-General, and *Frank L. Greenwald,* Deputy Attorney-General, for the State.

TRAVIS, J.—Appellant appealed from the judgment that he be imprisoned at the Indiana State Prison for a period of not less than two nor more than 14 years, rendered upon the finding of the court that he is guilty of the crime of "bunko-steering," as charged by affidavit. Acts 1905, ch. 169, §562, §2687 Burns 1926.

A narration of the evidence given by Joe Poroshek and two police officers shows that Joe Poroshek, the prosecuting witness, had resided in Indiana Harbor, a part of the city of East Chicago, Lake County, Indiana, for a period of three years, and had known Dan Popovich, the appellant, for two and a half years. On the last day of April, Popovich was waiting for Poroshek at the gate of the factory where Poroshek was employed,

at 4:45 o'clock in the evening. Dan came to walk home with him. Joe said to Dan that he usually rode home in the bus, but Dan said, "What's the use to pay five cents fare?" and Joe replied, "If you ain't got five cents to pay fare, I'll pay it for you." Dan said he would not ride in the bus. When they were near Washington Park, on the walk home, they met another man whose name Joe did not know, and who asked Joe and Dan: "Did you fellows see any little boy about fourteen years of age; I gave him a ten dollar bill to change and he never returned it." Joe said he had not seen the boy because he was in the shop, but Dan may have seen him, because Dan was outside. The stranger then said, "Never mind the boy," and asked Dan "if I am the right man"; Dan replied "Yes, he's the right one; I know him well." Then Joe started to walk home and Dan said, "Don't go yet," and Joe stopped to listen to this "third man." They did not stop, but all walked together toward Joe's home. During the walk the third man said, "If you are both right men, I going to tell you the truth, I came here from California with $30,000, which I got to give to those people who was working for my father. My father was a contractor in Indiana Harbor twenty-five years ago, and I got the money to give these fellows who was working for my father that time." When Joe replied that he had been in Indiana Harbor only three years and "I don't know anybody for such a long time," Dan said, "That's easy to find out, you don't have to do nothing to find out" the addresses of those people who worked for the stranger's father, who had been dead about three months. The stranger said he could not work with them, because he had his own job; but would pay Joe ten dollars a day if he would work with Dan. Then Dan asked if they could not "stay in one room for a time, if we are going to work with him." Joe said, "No, I've got my own

room and I going to stay in my own room." The stranger gave Dan some money, and then Joe left them on the street and went to his room. Dan followed and arrived at Joe's room in 10 minutes and said he was waiting for Joe. Dan left Joe's room while Joe was washing and changing clothes and returned in 10 or 15 minutes. Dan and Joe then went to a restaurant for supper. Dan then asked Joe to go with him to a moving picture show. Joe said to him he would not pay 35 cents for a moving picture; and Dan said, he had money and would pay. After the show, which the two attended, Dan suggested that they go to a hotel for the night, and Joe said, "What's the use to go to a hotel when I've got my own room and you have your own room? We can go to my room or to your room." Dan said, "No, there's lots of people looking at me and we'll go to the hotel and I'll pay for it." They went to the hotel, and, after sleeping together, and after breakfast in the morning, they went to the place where they promised to meet the stranger who was waiting to meet them close to the Greek Church. Dan and the stranger said to Joe that Washington Park was a nice place in which to rest and sit down, after which the three went to the park. The stranger then began talking about his case, and asked Joe and Dan how long they had been in this country and if they had saved anything. Joe answered that he had nothing, and Dan answered that he had $2,000, but it was in the bank. Then Dan said to Joe, "Oh, you told me the other day, you had two thousand dollars in the bank," which Joe had said to Dan a month or two before this time.

The stranger asked them to show what money they had, and Dan said that he would go to the bank and get it and show it, and departed and returned in about 10 minutes with a big bunch of 10 and 20-dollar bills, which he said amounted to $2,000. Dan then said to Joe that

Joe had money and he better go and get it to show to the stranger. The stranger had told Joe and Dan that he didn't want to do anything with a man who had nothing; that they would have to put up their money for security. Joe then drew $675 out of the bank. He had $60 in his pocket. After leaving the bank, Joe returned and met Dan and the stranger on Elm Street and they then went to Washington Park, because Dan and the stranger said it "is a nice place to sit down and rest." When sitting on a bench in the park, the stranger said, "I need a little suit case to put my clothes in and put half-dozen bananas in and about half-dozen oranges that I need for lunch. I can't eat nothing here. I got so used to that fruit, and I can't eat anything but fruit." The stranger then sent Dan to buy a little suit case. He was away about 20 minutes and returned with a small suit case. The stranger said, "This box is no good, I didn't told you to bring that; I told you to bring a little suit case." Dan suggested getting another one, and left and returned with a tin lunch box. The stranger then said, "Well, what money I have I better put it into this box, and keep it in this box," indicating the tin lunch box, which was four inches high, seven and a half inches long and five inches wide, with a wooden handle and a tin clasp, because the money was too heavy for him to carry in his pocket. Dan then said, "We put ours, too, in there." Then Dan wrapped his money in a handkerchief and put it in the box. The stranger put "this bunch" in the box in a manilla envelope which he said was money. Joe did not look into the stranger's "bunch" (package). Then Joe put his money, $735 of "lawful money" on top of Dan's handkerchief package in the tin box which Dan was then holding. The box was open with a handkerchief over it and "Dan's hands were right on top of this box." Then the three men kneeled on the ground round the box. Dan then

held his hands over the top of the box, about two inches above it, with the lid open, then the stranger told Joe to put his hands above Dan's hands, about two inches above, and the stranger put his hands over the box above Joe's hands. Then the stranger and Dan prayed silently for about two minutes to bless the box. Then they took their hands away from over the box, and Dan closed the lid to the box and locked it with a padlock. Dan held the box for a few minutes and handed it to Joe, telling him to take it to his room and to put it into a big trunk so nobody would steal it, and to return "and we go to work together and we make money." Joe took the box to his room, locked it in a suit case, and returned to the place where he left Dan and the stranger, but they were not there, and he waited for them until two o'clock in the afternoon, but they did not return, and he never saw the stranger afterward.

After the wait for three hours, Joe returned to his room and broke open the box, which was still locked with the padlock. He then looked in one handkerchief and found it contained a bunch of newspapers, but no money, then into another handkerchief, and it was full of newspaper, but no money. In the heavy manilla paper envelope in the bottom of the box, which was put into the box by the stranger, he found three dollars. Joe went to the police and told his story. Joe did not see Dan until 30 days thereafter, when he notified the police. The police went to the place where Joe saw Dan and arrested him. At the trial, the police officer who arrested Dan testified that he "asked Dan who was his partner when they pulled off the deal." He kind of smiled and said, "Little Jake," and that he did not know where Little Jake was. In reply to the question of the police officer to Dan after his arrest, "Just what was your share of that money that you got?" Dan replied, "about two hundred sixty dollars was my share, and that there was

seven hundred thirty dollars we got off that man altogether."

The affidavit which charged the offense alleged that Dan Popovich did then and there unlawfully, wrongfully and feloniously allure, entice and persuade Joe Poroshek to go to Washington Park in the city of East Chicago, Lake County, Indiana, with Dan Popovich and another man, whose true name is unknown to the affiant, upon a pretense to obtain certain information from affiant regarding the addresses and whereabouts of certain persons with whom Dan Popovich said affiant was acquainted, and that Dan Popovich was trying to locate such persons for the purpose of assisting the other man, who was with Dan Popovich, in distributing among such persons $30,000, being a legacy due such persons from the estate of a wealthy contractor who died in California, and of whose estate the man, then and there in company with Dan Popovich, was the administrator.

Upon entering Washington Park, Dan Popovich represented to this affiant (Joe Poroshek) that if this affiant would show that he had money, and was a responsible person, the $30,000 would be entrusted to him and Dan Popovich for distribution among such persons; and Dan Popovich then and there took from the man who was with him a small tin box, and, showing it to affiant, stated that it contained $30,000, and, lifting the lid off the box, showed affiant a roll of paper currency, and then and there stated that he, Dan Popovich, would put in another roll of currency containing $2,000, which belonged to Dan Popovich, providing affiant would also put in a substantial amount to show that he was a responsible person; and that, upon depositing the money in the box by affiant and Dan Popovich, it would be placed in affiant's hands for safe keeping. Affiant, relying upon such statements made by Dan Popovich, did then and there put into the box $735 lawful money of the

United States, and deposited it into the tin box which Dan Popovich then and there held in his hands, and Dan Popovich pretended that he was also depositing a roll of money containing $2,000, but which, in truth and in fact, was a roll of paper, and at the same time removed the money affiant put into the box, and after so doing gave the box to affiant for safe keeping, after locking it, and that by means of the fraudulent and deceitful trick and misrepresentations induced affiant to part with said money, then and there of the value of $735, contrary, etc.

Appellant's motion to quash the affidavit which charged the offense was overruled.

Appellant presents as errors the action of the court: (1) Overruling his motion to quash the affidavit; (2) overruling his motion, made at the close of the State's case, for a finding that he was not guilty; and (3) overruling his motion for a new trial, the causes for which are: (a) the decision of the court is contrary to law; and (b) the decision of the court is not sustained by sufficient evidence.

The crime charged is that defined by the second part of §562, ch. 169, of acts of the General Assembly 1905. Appellant makes the points to support his motion to quash: (1) That, by the allegations of the affidavit, the prosecuting witness "was not to part with his money by reason of the representations charged, or of any trick, alleged"; (2) that the affidavit shows that when the prosecuting witness put his money in the box to be held by him for safe keeping, appellant, by some "legerdemain," took the prosecuting witness' money from the box, shows that the crime of larceny was committed and not the crime of bunko-steering; and, because the affidavit does not charge the elements of larceny, the affidavit does not charge a public offense; and (3) that the allegation of inducement by the language of the affidavit to wit, "and that by means of the fraudulent and deceitful

trick and misrepresentation induced this affiant to part with said money," etc., is a conclusion, without force and effect to charge the crime of bunko-steering.

Under appellant's first point, the inducement (representations) made to the prosecuting witness to part with his money, was to show that he might and could be intrusted with the stranger's $30,000. It is alleged that the prosecuting witness put his money in the tin box then and there and that Popovich thereafter removed Poroshek's money from the box, when pretending that he was depositing his $2,000 therein. The allegations are sufficiently clear as to the intent that Poroshek was to be induced to part with his money, and that the scheme to accomplish such parting was the trick and artifice alleged.

By appellant's second point, it seems to be proposed that because Popovich took Poroshek's money from the tin box by some "legerdemain," taken together with other allegations, the crime of bunko-steering is not charged. The allegation, as stated by appellant, considered with other allegations, states that Poroshek parted with his money by the inducement that "if this affiant would show that this affiant has money, and is a responsible person, the $30,000 would be intrusted to this affiant and the said Dan Popovich for distribution," etc. This is sufficient to charge the inducement upon Poroshek to put his money in the tin box—to part with the money. Whether the affidavit, by its allegations, shows that the crime of larceny was committed, but is not well pleaded, is not of concern here. Were appellant convicted of larceny for the same taking of the money of Poroshek, whether former conviction could be well pleaded would be then presented; it is not presented for decision now. *Fleming* v. *State* (1910), 174 Ind. 264, 91 N. E. 1085.

Under the third point, it is not decided whether the quoted part of the affidavit is merely a conclusion. If the quoted allegation has any merit, it is to charge the trick or artifice by which Poroshek was induced to put his money in the tin box—part with anything of value. The artful, ingenious and elaborate trick by which Poroshek was induced to part with his money, by placing it in the tin box, is well pleaded by other allegations. If the allegation now presented be a conclusion, it is not so decided, because it may be a surplus of allegation to set up a material element of the crime. Appellant's motion to quash the affidavit is not well founded.

Appellant's second and third errors will be considered together. Appellant did not introduce any evidence; wherefore, if the evidence presented by the State, being competent, was sufficient to prove beyond a reasonable doubt each material element of the crime charged to have been committed, his motion, made at the close of the evidence by the State, and before proceeding with evidence for the defense, that a finding be made by the court that appellant is not guilty, should be overruled.

The point is made by appellant in his brief that the finding of guilty is not supported by sufficient evidence, because the evidence shows that Poroshek "did not voluntarily by reason of the false representations and the device or trick alleged and proven, *voluntarily* part with the title or possession of his moneys which is a material element of the charge (crime) of bunko-steering." Title to "anything of value" is one thing in law, and possession of such thing may be entirely another. Title is not used in defining the crime, neither is possession. The word *part* is used. The meaning of the word *part* in defining the crime, is "to relinquish a connection of any kind; followed by *with* or *from*; as to

part with . . . a possession." (Webster's New International Dictionary.) To *part* with a possession, does not necessarily mean to *part* with title. Title implies possession, either actual or constructive, but possession does not necessarily imply title. Holmes, Common Law pp. 207, 246; *Thompson* v. *Wanamaker's Trustee* (1920), 268 Pa. 203, 212, 110 Atl. 770, 773; *Bourne* v. *Fosbrooke* (1865), 144 Eng. Rep. (Reprint) 545, 549. See *Hunter* v. *Royal Ins. Co.* (1924), 209 App. Div. (N. Y.) 15, 17, 203 N. Y. Supp. 833, 834.

The word possession, in its use to aid in defining the word part, used in the statute to define the crime, must be considered with more than passing attention. The word possession has been given so varied and extensive a definition that it deceives by its ambiguity of meaning. *Nation Safe Deposit Co.* v. *Stead* (1914), 232 U. S. 58, 67, 34 Sup. Ct. 209, 58 L. Ed. 504; *Bourne* v. *Fosbrooke, supra.*

It is held, in defining the crime of bunko-steering, that to possess a thing parted with, it is not necessary that the one who parts with the thing of value has such a property right in such thing as vests in him a legal title of ownership. Title to the thing of value parted with is not an essential element of the crime of bunko-steering. The evidence was presented by the State, and admitted by the court, without exception by appellant. There is sufficient competent evidence, beyond a reasonable doubt, to prove that appellant allured, enticed and persuaded Poroshek, by the pretense as pleaded, to go to Washington Park, in the city of East Chicago, Lake County, Indiana; and that appellant then and there, on the day alleged and proved, induced Poroshek to part with his money, of the value of $735, by means of the trick to induce him to part with his money by putting it in the tin box, then in the possession of Popovich; and of removing Poroshek's money

from the tin box, which tin box was the device through which the trick was accomplished. The finding of the court, that appellant is guilty as charged, is sustained by sufficient evidence, and is not contrary to law.

Judgment affirmed.