THE STATE OF IOWA, Appellee, v. JOHN R. DOBBINS, Appellant.

**Criminal law:** LARCENY: FELONIOUS TAKING. While there is a technical distinction between larceny and cheating by false pretense, in that the former crime involves a felonious taking, still where possession of the property was obtained by deceit, with a secret intent to deprive the owner thereof, the fraud practiced in obtaining the possession will supply the place of trespass in the taking and make the conversion felonious. Thus where defendant induced the complainant to intrust his money to a stakeholder in a fraudulent horse racing scheme, on the representation that the transaction amounted simply to a deposit of the funds to induce more betting on the part of others and that the money would be returned, when in fact the intent of defendant and his confederates was to convert the money to their own use, the crime was larceny and not cheating by false pretense.

**Same:** INDICTMENT: DESCRIPTION OF OFFENSE. It is not necessary in charging larceny to allege the particular method and manner of the unlawful taking, carrying away and conversion of the property; the charge that defendant feloniously took, stole and carried away certain described property of another is a sufficient description of the larceny.

**Same:** REMARKS OF COURT: REVIEW. Alleged improper remarks of the court concerning the effect of evidence, to which no exception was taken at the time, will not be considered on appeal.

**Same:** INSTRUCTION: WEIGHT OF EVIDENCE. The court on this prose-

cution for larceny, charged that it was the contention of the state that defendant with others had conspired to defraud persons generally, and that to support the charge it was required to show that the parties, or some of them, had by means of the conspiracy defrauded other persons than the complainant, but before such testimony could be considered for any purpose it must find that defendant had participated in such a conspiracy. *Held,* that the instruction was not objectionable as indicating the court's opinion of the weight of the evidence.

**Same:** EVIDENCE: OTHER OFFENSES. On this prosecution a witness was allowed to testify that he had been swindled by the parties involved in this transaction through a like scheme, but was not able to connect defendant with the transaction further than that he saw him in association with the other alleged conspirators. *Held,* that while the testimony was not competent for the purpose of establishing the conspiracy, yet if the conspiracy was established by other evidence, it was admissible on the question of its scope and purpose.

**Same.** The mere fact that defendant's connection with the alleged conspirators was not shown until a date subsequent to a prior larceny, committed by them in the same manner, did not render evidence of the prior larceny inadmissible to show the scope and purpose of the conspiracy.

*Appeal from Pottawattamie District Court.*—HON. W. R. GREEN, Judge.

WEDNESDAY, OCTOBER 18, 1911.

THE defendant appeals from a judgment of conviction on charge of larceny.—*Affirmed.*

*Harl & Tinley, George S. Wright, E. J. Mulick,* and *W. E. Mitchell,* for appellant.

*George Cosson,* Attorney-General, *H. W. Byers, John J. Hess,* and *John P. Organ,* for the State.

WEAVER, J.—The indictment is in the ordinary short form, charging that on or about October 13, 1908, the defendant did wilfully, unlawfully, and feloniously take,

steal, and carry away $30,000 lawful money of the United States belonging to one T. W. Ballew. To this accusation the defendant entered a plea of not guilty.

It is the theory of the state that defendant, with several other persons, entered into a conspiracy to defraud whomsoever they might be able to deceive by means of pretended horse races, upon the result of which the victims of the deception were to be induced to stake or risk their money, and that, in pursuance of such conspiracy, the said confederates did take from the complaining witness a large sum of money in a manner and by methods which in legal contemplation amounts to larceny. In support of this claim, a large amount of testimony was offered tending to show that defendant and another man known by the name of Martin approached Ballew, who was a person of considerable wealth and business experience, and represented to him that several "millionaires from Pittsburg, Pa.," were traveling leisurely over the country promoting new railroads and buying bonds, and, as a means of diversion or relief from the burden of their business cares, they took with them in their journeying a race horse in order that they might have a "little fun once in a while." Their wealth was such, Ballew was told, that they were indifferent to the losses they might sustain, and their confidence in the speed of their horse was so great they were willing to back him without limit. They were, however, of such eminently respectable and discreet character they would not bet their money with professional sports and gamblers, to which class defendant and Martin admittedly belonged, and, in order for the latter to obtain any wagers with these exclusive gentlemen, the transaction must be negotiated through some other person. Martin further represented that he had been to California, where he discovered and purchased a horse, which had been privately tried and tested and found to be a much better animal than the one owned by the "Pittsburg mil-

lionaires," and, if a race could be arranged, it was an absolute certainty the latter animal could be beaten, and a large amount of money won from its owners. On this showing Ballew was urged to go to Council Bluffs and become a backer of the California horse. He was told he need not risk a dollar himself, and need only bet the money which would be furnished him by others, and for his services he would receive ten percent of the winnings.

Defendant was an old acquaintance of Ballew, and vouched for the honesty and reliability of Martin. Ballew, after some urging, consented to play the part thus assigned him, and went with the parties to Council Bluffs, where the millionaires and their horse were said to be, and where arrangements had been made for a race. On arriving at Council Bluffs, Ballew was introduced to one Wilson, who was said to be the private secretary of the millionaires and brother-in-law of Martin. Wilson represented that his wealthy employers had not treated him fairly, and he was willing to help beat their horse in the race. To that end, he said he and Martin had privately raced the two horses together, and Martin's was by far the better and faster, and was certain to win. He asked Ballew if he had any money or drafts with him to exhibit if any question were raised as to his financial ability to take part in a game of these proportions, and thus secure large bets from the millionaires. Yielding to the request of the conspirators, Ballew obtained bankers' checks or drafts to the amount of $30,000. By agreement with the millionaires, Wilson was selected as stakeholder, and at a meeting in a room in a hotel the betting began. Ballew was furnished a considerable sum of money by Martin with which he covered the wagers offered by the backers of the Pittsburg horse. At the close of the session, the bets aggregated many thousands of dollars. After adjournment, Ballew was told that the millionaires were still anxious to put up more money on the race, but Martin

and his friends had exhausted their funds. In order to increase their bets and consequent harvest of winnings, they suggested that Ballew cash his checks and bet the money for them, and promised that, if he would do so, Wilson, the stakeholder, who was interested with them, would return it as soon as the betting was over, and before the race was pulled off. The scheme worked, Ballew obtained $30,000 in cash, and with it covered the wagers offered against the Martin horse. When the money was all in the stakeholder's hands, a pretended controversy arose between some of the alleged conspirators in regard to a claimed mistake in recording the bets, and a demand was made that the money be counted. This was objected to, but a "compromise" was agreed upon, by which the stakeholder swept all the money into a valise, where it was to be held until the race was over, and then all dis-putes were to be adjusted.

Proceeding to the race track, the horses were brought forth and a start made, from which the Martin horse took the lead. Before the course was completed, however, the rider of the Martin horse pretended to become suddenly ill, fell forward on the animal's neck, when the Pittsburg horse passed him, and came first under the wire. A simulated quarrel immediately arose between the "opposing" ranks of backers, in the midst of which an alarm was given that the police were coming, and all persons engaged in the deal were liable to be immediately arrested. Thereupon the crowd separated, the several members pretending to hasten out of the city. Wilson told Ballew that his money had been deposited in a safety vault, and that he would at once get it, and bring it to him at Kansas City, Mo., which, of course, he never did. It is also the theory of the state, and there is evidence tending to show, that the $30,000 thus fraudulently obtained from Ballew was divided between the conspirators; the defendant herein receiving $7,500 for his share of the spoils.

The foregoing outline of the evidence is by no means full or complete, but it is sufficient to indicate in a general way the nature of the case made by the state. The appellant, who offered no evidence in his own behalf, does not seriously contend that no crime of any kind is disclosed by the record, but plants his demand for a reversal of the judgment against him on the proposition: (1) That the crime, if any, thus shown, is not larceny; (2) that the evidence offered in support of the charge is not admissible under the allegations made in the indictment; (3) that the court erred to his prejudice in its rulings upon the admission of evidence; and (4) that the court erred to his prejudice in the instructions given to the jury and in refusing his requests for other instructions.

I. The contention that the offense, if any, shown by the evidence is not larceny, and therefore does not support the verdict and judgment in this case, presents the

1. CRIMINAL LAW: larceny: felonious taking.

first important question urged in appellant's argument, and upon its decision many of the other propositions made in his behalf will necessarily turn. Stated in brief terms, the contention is that Ballew in passing his money to the stakeholder intended to part with his title thereto, and that, if such be the case, there was no larceny, but the offense, if any, was that of cheating by false pretenses.

It is true that larceny and cheating by false pretenses are distinct offenses, and that under a charge of one of these crimes the accused can not rightfully be convicted upon proof of the other. *State v. Loser,* 132 Iowa, 429. It is also true that the line of technical distinction between larceny and false pretenses is sometimes quite obscure and difficult to trace, and the decided cases, especially where money has been obtained by means of a pretended wager, are not altogether harmonious, but we are not disposed to increase the confusion by indulging in overrefinement of definition, which serves less to uphold

and protect substantial rights than to open doors of escape to violators of the law. Speaking to this point in a case very similar to the one at bar, the Michigan court well says: "There is some rather attenuated discrimination to be found in the books between such cheats as induce a person to give temporary custody of his property to another who keeps or disposes of it and those by which he is induced to part with it out and out. We do not think it profitable to draw overnice metaphysical distinctions to save thieves from punishment. If rogues conspire to get away a man's money by such tricks as those which were played here, it is not going beyond the settled rules of law to hold that fraud will supply the place of trespass in the taking and so make the conversion felonious." *People v. Shaw*, 57 Mich. 403 (24 N. W. 121, 58 Am. Rep. 372).

That a felonious taking is necessary to constitute larceny and that, generally speaking, a taking which is accomplished with the consent or acquiescence of the owner of the property is not felonious, will be readily conceded, but where such consent is obtained by fraud or trick with promise to return the property after it has served some temporary use or purpose, but with the secret intention on the part of the receiver to convert it, then, as has already been said, the fraud supplies the place of trespass in the taking, and the offense committed is larceny. Says the California court: "Consent to deliver the temporary possession is not consent to deliver the property in a thing, and if a person, *animo furandi*, avail himself of a temporary possession for a specific purpose obtained by consent, to convert the property in the thing to himself and defraud the owner thereof, he certainly has not the consent of the owner. He is acting against the will of the owner, and is a trespasser." *People v. Rae*, 66 Cal. 423 (6 Pac. 1, 56 Am. Rep. 102). The rule as thus stated has been frequently recognized in cases substantially like

the one we are now considering, and is too manifestly just
and wholesome to require further discussion at our hands.
*State v. Loser, supra; State v. Ryan,* 47 Or. 338 (82
Pac. 703, 1 L. R. A. (N. S.) 862); *Miller v. Common-
wealth,* 78 Ky. 15 (39 Am. Rep. 194); *People v. Shaugh-
nessy,* 110 Cal. 598 (43 Pac. 2); *Johnson v. State,* 75
Ark. 427 (88 S. W. 905). The showing made by the
state which appellant has in no wise undertaken to con-
trovert except by his plea of not guilty makes it apparent
beyond all doubt that Ballew, the quality of whose char-
acter and motive is not of controlling importance, was
made the victim of a gross fraud in which the appellant
was an active and influential agent, and was by defendant
and his confederates robbed of a very large sum of money,
possession of which was obtained under pretense that it
was to be temporary only, but with the secret intent to
deprive him thereof permanently and entirely. If this
does not constitute larceny, it will be very difficult to
frame any definition of that crime through which a cun-
ning thief may not find an avenue of escape with his
booty. The trial court instructed the jury, in effect, that
if Ballew gave his money as a bet to the stakeholder who
received it for that purpose, and not as part of a scheme
in which the stakeholder participated to get possession of
it, and appropriate it without regard to the event on which
the wager was made, then the taking was not felonious,
and defendant should be acquitted.

The jury were further told as follows:

(7) If Ballew was induced by parties acting in fur-
therance of such a conspiracy to deliver his money to one
of the conspirators under a promise that it would be re-
turned to him, which he believed, and expected its return,
but that the transaction as a whole on the part of the
persons who were conducting it with Ballew was merely
a trick or scheme to get the money into their possession,
they having at the time an intent to appropriate and con-
vert it to their use, and that having by means thereof ob-

tained possession of Ballew's money they did so appropriate and convert it under color of their transactions designed to deceive and mislead him, this would make out the crime charged in the indictment, and, if defendant was a party to such conspiracy, he should be found guilty. Whether Ballew expected the same money to be returned, or that it would be exchanged for its equivalent which would be returned to him, would make no difference in this connection if either is shown.

(8) It is claimed on behalf of defendant that Ballew put his money in the hands of a stakeholder as a bet. On this point you are instructed that even though you find that Ballew parted with his money by delivering it, or having it delivered to another to be held as a stake upon a bet, if the evidence shows that he was induced so to do by parties acting in furtherance of a conspiracy to defraud him, among whom was the stakeholder, that the betting of other parties was merely simulated, the race a mere pretense and a sham, and all the transactions had with him merely part of a scheme to obtain possession of his money by trick, deceit, or fraud, and then appropriate and convert it, and, pursuant thereto, the money of Ballew was appropriated and converted to their use by the parties so dealing with him, this would also make out the crime charged in the indictment, and, if the defendant was a party to such conspiracy, he should be found guilty.

This we think stated the law as favorably to the defendant as he was entitled to expect or demand. That precedents may be found which state the rule much more narrowly must be admitted. Counsel for the defense have collated them with industry, and in argument zealously press them upon our attention, asking us to broadly hold that if Ballew intended that the title to the particular money delivered by him should pass to the stakeholder, no matter by what deception, fraud, trick, or device that intent was induced, the charge of larceny can not be predicated on the transaction, and that the jury should have been so instructed. We are not willing to so hold. The instructions are in substantial harmony with the views

we have expressed, and the exceptions taken thereto can not be sustained.

II. It is further urged that, as the indictment does not set forth the particular acts done or methods alleged to have been employed by the appellant in perpetrating the offense, evidence of such acts and con- duct is not admissible. It has been too often held to admit of argument that an allegation that the accused feloniously took, stole, and car- ried away certain described money, goods, or chattels of the property of another is a sufficient description of the offense of larceny. The method and manner of the un- lawful taking and carrying away or conversion are mat- ters of evidence merely, and need not be pleaded in the formal charge. No authority holding otherwise in a case of common law larceny has been called to our attention by counsel, and we are quite confident none is to be found.

*2. SAME: indictment: description of offense.*

III. In the course of the trial below, the court in ruling upon certain objections to testimony and explain- ing its views concerning the question so raised spoke of the testimony already introduced as "tending to show that defendant entered into a fraud- ulent scheme whereby Ballew was deprived of his money in a manner amounting to larceny." Other language of similar effect was made use of by the court. As this statement was made in the presence of the jury, error is assigned thereon. The record does not disclose any exception taken at the time by defendant to the lan- guage of the court, and we need not, therefore, stop to consider whether, if objection had been made thereto and the statement had not been withdrawn or modified, it would have constituted reversible error.

*3. SAME: remarks of court: review.*

In its formal charge to the jury, however, the court, after stating the claim of the state that defendant and others had conspired together to defraud persons generally, said that: "To support this claim, the state has intro-

duced testimony tending to show that the parties or some

**4. SAME: instruction: weight of evidence.** of them with whom the defendant is alleged to have thus colluded had, pursuant to such conspiracy, and through and by means of such a scheme, defrauded other parties than Ballew, both before and after the transaction with the prosecuting witness." The jury were then told that, before considering such testimony for any purpose, it must first be found from other evidence that defendant entered into a general conspiracy of that character, and, if such fact had not been established, then the testimony first mentioned should be disregarded altogether. This reference to the testimony and its tendency is excepted to as indicating to the jury the opinion of the court upon a material fact. Taking it as a whole, we see nothing to criticise in the instruction complained of. It is, of course, of the highest importance that the court should refrain from invasion of the province of the jury and avoid all expression of personal opinion concerning the truth of evidence offered on either side, but this rule does not appear to have been here transcended. The instruction was clearly intended to protect the rights of the defendant, and limit the use and effect of the particular testimony there mentioned to its legitimate purpose. No prejudice could have resulted to the defense therefrom.

IV. The state produced as a witness one Bedford, who, over defendant's objection, was allowed to testify that in August prior to the transaction now under consideration,

**5. SAME: evidence: other offenses.** which took place a month or two later, he saw defendant with the alleged millionaires and their confederates in the city of Council Bluffs. He then proceeded to state that his said visit to said city had been induced by one of the men who gave the name of Carson, and that by means very similar to those alleged to have been employed in influencing Ballew he had been swindled by these parties out of a large sum

of money. This witness did not identify the defendant as taking part in the race or the spurious betting by which he was swindled, but claims that immediately prior thereto he saw defendant in association with the other alleged conspirators. Referring to this class of evidence, the jury was told it could not be considered for the purpose of finding a conspiracy, but, if such conspiracy had been otherwise established, the testimony was admissible upon the question of its scope and purpose. The admission of this testimony and the use thus made of it are also assigned as error. We are disposed to hold the testimony admissible for the purpose indicated by the trial court.

The fact that defendant's active connection with this alleged league of swindlers is not shown until a somewhat later date is not a sufficient objection. There is abundant evidence showing such connection subsequently with the transaction whereby Ballew was relieved of his money. The existence of a conspiracy at that date at least is sufficiently established. Then, if not before, he became a party to it, and, while he may perhaps not be held criminally liable for offenses committed prior to his participation therein, he will be presumed to have known the character and purpose of the unlawful combination. Its character and purpose may, we think, be shown by its acts and conduct prior as well as subsequent to the date of his entrance into its machinations.

6. SAME.

There was no error in the admission of the testimony, or in the instruction limiting its use by the jury. What we have here said applies equally to the testimony of several other witnesses giving testimony similar in character to that of Bedford.

Other exceptions have been briefly suggested by counsel, but we can not properly prolong this opinion for their discussion.

We have examined the record with reference to each point made, and find no reversible error. There is no

room for question as to the justice of the verdict of the jury. The rights of the defendant appear to have been carefully guarded by the trial court, and there is nothing to justify interference by us with the judgment appealed from.—*Affirmed.*