STATE OF IOWA, ex rel. GEORGE COSSON, Attorney General, Appellant, v. W. L. BAUGHN.

**Municipal corporations:** REMOVAL OF MAYOR: EVIDENCE. The mayor 1 of a city cannot be removed from office, under chapter 78 of the Acts of the 33rd General Assembly, except upon grounds specified in the statute; other acts of misconduct than those specified are immaterial in an action for his removal.

**Same:** INTOXICATION: EVIDENCE. Intoxication, as used in the statute 2 authorizing removal of a mayor from office for that reason, does not necessarily mean that he was so drunk as to have lost control of himself: but if he was so far under the influence of liquor as to affect his faculties or reason, or to render him incoherent of speech, or to cause him to lose control in any manner or to any extent of the action or movement of his person, he was intoxicated within the contemplation of the law. Evidence held to show that defendant was in an intoxicated condition and to justify his removal.

**Same:** RESIGNATION: REAPPOINTMENT: REMOVAL. The fact that a
3  mayor, subject to removal for drunkenness, resigned his office
and was immediately reappointed to the vacancy by the council
would not affect a right of action subsequently brought for his
removal.

*Appeal from Shelby District Court.*—HON. H. K. EVANS,
Judge.

SATURDAY, NOVEMBER 22, 1913.

ACTION to remove the defendant from the office of mayor
of the city of Harlan resulted in the dismissal of the petition.
The state appeals.—*Reversed.*

*George Cosson,* Attorney General, and *John Fletcher,*
Assistant Attorney General, for the State.

*Tinley, Mitchell & Pryor,* for appellee.

PER CURIAM.—The defendant was elected and duly quali-
fied as mayor of the city of Harlan in April, 1912. He re-
signed July 29, 1913, and was appointed by the council to
fill the vacancy August 5th following, and again qualified.
Complaint was filed with the Governor Sept. 3d thereafter, in
pursuance of chapter 78 of the Acts of the Thirty-third Gen-
eral Assembly, and by his direction, this action was begun
December 26, 1912, for his removal from office. The petition
covers a wide range, but the only debatable ground for re-
moval under the evidence was the charge of having been intoxi-
cated in the evening of July 28, 1913.

That he may have been eccentric in manner, exaggerated
his own importance, especially as mayor, and indulged in
coarse language, talked loud on the streets, or carried on fac-
tional controversies into private intercourse
with his neighbors, however offensive, will
not warrant any interference with his incum-
bency. Tastes differ, and the characteristics which are ap-

1. MUNICIPAL
CORPORATIONS:
removal of
mayor:
evidence.

proved in one community may be condemned in another, or even in the same community at different times. It was for the electors of Harlan to say whether they wanted "Bill" Baughn for mayor, and if a majority so decided, it is not for the courts to determine whether in electing him, they exercised good judgment. Of course, there are some things he might well have .omitted; for instance, this piece of alleged wit, included in a notice requiring dogs to be registered and wear collars: "Also you two-legged dogs that are visiting your neighbors' wives when their husbands are away, look out or the marshal will catch you with your shoes off." And it might have been as well had he prosecuted such actions, as he might have deemed for the interest of the municipality, without trying them out on the street corners. But, as said, the majority wanted such a person for mayor, and though he was rough and of violent temper, as his admitted encounters indicated, he is entitled to continue in the office unless there exists some statutory ground for his removal. On the other hand, good character, which many of his neighbors say he possesses, affords no defense if guilty of any of the misconduct denounced by statute. The evidence was insufficient to warrant a finding that he was intoxicated at Council Bluffs. The most that can be said is that he liked the brand of whisky there, and partook of it when visiting that city, which was frequent, but the evidence bearing thereon did not warrant a finding that he ever became intoxicated while there. Whether he was in that condition in the evening of July 28, 1913, the evidence is in conflict.

The statute specifies "intoxication" as one of the causes for removal (chapter 78, Acts 33d G. A.), and that word is thus defined in *State v. Pierce*, 65 Iowa, 85, "a person is drunk in a legal sense when he is so far under the influence of intoxicating liquors that his passions are visibly excited or his judgment impaired," and it was said in *State v. Huxford*, 47 Iowa, 16: "When any person, from the use of intoxicating liquors, has

2. SAME: intoxi-
   cation: evi-
   dence.

affected his reason or his faculties, or has rendered him inco-
herent of speech, or has caused him to lose control in any
manner, or to any extent, of the action or motion of his person
or body, such person, in contemplation of law, is intoxicated.''
These definitions are in accord with those laid down in other
states. Thus it was said in a lucid instruction quoted in
*Elkin v. Buschner* (Pa.) 16 Atl. 102:

Now what do we mean by a man being drunk or intoxi-
cated? We often have very contradictory testimony on that
subject. One man will say a person was drunk at the time
of a certain occurrence. Another will say that he was not
drunk; that he was sober. A great deal of such testimony
can be explained by the different ideas those persons have
as to what is meant by drunkenness or intoxication. There
are degrees of intoxication or drunkenness, as every one
knows. A man is said to be dead drunk when he is per-
fectly unconscious—powerless. He is said to be stupidly
drunk when a kind of a stupor comes over him. He is said
to be staggering drunk when he staggers in walking. He is
said to be foolishly drunk when he acts the fool. All these
are cases of drunkenness—of different degrees of drunken-
ness. So it is a very common thing to say a man is badly
intoxicated, and again that he is slightly intoxicated. There
are degrees of drunkenness, and therefore many persons may
say that a man was not intoxicated because he could walk
straight; he could get in and out of a wagon. What is meant,
gentlemen of the jury, by the words in the statute which
makes it a penal offense, and also the party liable in a civil
action for damages, for giving liquor to a man that is 'drunk
or intoxicated' (because both words are used in the statute),
and also, 'selling to a man of known intemperate habits'?
Whenever a man is under the influence of liquor so as not
to be entirely at himself, he is intoxicated; although he can
walk straight, although he may attend to his business, and
may not give any outward and visible signs to the casual ob-
server that he is drunk, yet if he is under the influence of
liquor so as not to be at himself, so as to be excited from it, and
not to possess that clearness of intellect and that control of
himself that he otherwise would have, he is intoxicated.

See, also, *Lafler v. Fisher*, 121 Mich. 60 (79 N. W. 934);
*Sapp v. State*, 116 Ga. 182 (42 S. E. 410); *Wadsworth v.
Dunnam*, 98 Ala. 610 (13 South. 597). Though some of the
witnesses sought to distinguish between the words "drunk"
and "intoxicated," they are synonymous. *Smith v. Bigelow*,
19 Iowa, 459; *State v. Kelley*, 47 Vt. 294; *Standard Life &
Accident Ass'n v. Jones*, 94 Ala. 434 (10 South. 530).

Some of the witnesses while insisting defendant was not
drunk thought him under the influence of intoxicating liquors.
This explains all statements out of court inconsistent with the
testimony given, and may account somewhat for the difference
of opinion as to defendant's condition at the time in ques-
tion. Though he testified positively that he was not intoxi-
cated, he admitted having drunk a glass of whisky at his
brother's house before starting downtown at about nine
o'clock in the evening, and related that on the way an indi-
vidual, whose name he did not know, invited him to drink,
and that the two stepped into an alley for that purpose, and
that, owing to the bad quality of the article, he spit it out.
In approaching the Harlan Hotel he walked up to C. R. Low
and another traveling man, according to Low's testimony, and
confided to them that he had gotten his drink in the cellar
of a certain man's house, and, noticing Shelby Cullison, turned
to him and said, "Shel, take me up to the McNal Rois and
get me a drink." Low testified that his tongue was thick; that
in talking with Cullison he was unable to speak the word
"automobile;" that he repeatedly made use of expressions
such as "damn it," "God damn," "sons of bitches," and the
like, and, in his opinion, was intoxicated. A crowd, variously
estimated at from fifty to two hundred people, gathered about
them, and that language such as testified to by Low was used
by defendant, speaking so loud that it might be heard across
the street, as stated by some, and two hundred feet as esti-
mated by others, was confirmed by Burlingame, Dorrance,
Hughes, Cullison, Booth, Smith, and Luecke. Moreover, all
these witnesses were of the opinion that he was intoxicated.

Burlingame noticed his repeated efforts to pronounce "automobile;" that his tongue was thick, and heard him denounce several persons as "sons of bitches," prefixing "thieving" in one instance. After talking to Cullison a while he turned on Booth, and, after denouncing matters relating to an addition and of automobile speeding, wanted to know who was running this town, the mayor, or the president (Booth) of the Automobile Association. There was also evidence that he did not stand steadily but weaved back and forth and used his cane on Cullison's breast to emphasize his words. His talk seems to have covered a wide range, seeking more whisky, denouncing the city clerk for his actions with reference to looking up the amount. paid two attorneys for services rendered, the attorneys for taking the money, others in relation to a contract for improvements of an addition to the city, violation of an ordinance fixing the speed limit for automobiles and the like, and, according to the above witnesses, the epithet mentioned was applied to about every one interested on the other side. Walters came along with his wife, and, noticing defendant in the crowd, excused himself long enough to rush in and try to persuade him to come away, and, though his good offices were declined, he noticed no indication of intoxication. As he was there but a moment, his opinion is of little value. Next came the city marshal who proceeded to disperse the crowd, and when he told defendant what he intended to do, the latter directed him to do his duty. This witness testified that he did not hear any profanity; that he stepped between defendant and Booth, and told the former "to cut out argument on the street." About this time, Booth and Hughes escorted defendant into the hotel. Whether he stumbled on the way in is in dispute, and is not very material, for it might have happened were he sober. When he came out, the marshal followed him, as he says, to inquire about an attack of lumbago from which defendant claimed to have been suffering. This witness says that Cullison and Booth were as much at fault as defendant, while other witnesses agree that

they were talking low and apparently with the purpose of quieting him. The marshal was of the opinion that defendant, who had appointed him, and on whom his tenure of office depended, was not intoxicated, and that while he heard something like "damn" or "God damn," he did not hear the more opprobrious epithet mentioned. O'Connell testified that he met defendant and shook hands with him as he came from the crowd in front of the hotel, and that in his opinion he was not intoxicated. Denison came up while defendant was talking with Booth, and heard them speaking about who was running the town, and thought him not intoxicated. Wilson, in going by, saw him talking with Cullison, and thought he talked loudly and was excited; was of the belief that he was not intoxicated. Butts heard the talk from about twenty feet away a little while, but did not notice who he was talking with, and though his talk was loud he "wouldn't have taken him to be intoxicated." R. E. Low met him on the way downtown, and did not notice anything in his conduct indicating intoxication.

It is also to be said that while eight witnesses for the state were in a situation to hear what was said and to observe defendant closely, only one or two of the five or six witnesses of defendant had this advantage. The circumstance that defendant refused to withdraw when requested by Walters and allow the crowd his loud talk had gathered to disperse was an indication that something was interfering with sound judgment. Denison was there but a few minutes during the conversation with Booth, and Wilson merely stopped for a moment. Butts seems to have been too far away for his opinion to be of value, and O'Connell merely shook hands with him, and passed the time of day. The marshal was busy dispersing the crowd, and at the first opportunity accompanied defendant away, and the crowd scattered. The record leaves no doubt but that defendant, whether drunk or sober, demeaned himself as a person under the influence of liquor, for in the first place he was looking for more whisky, whether really or merely

ostensibly in order to learn where it was kept, as he testified; and secondly, he used profane language and indulged in opprobrious epithets, and talked so loudly that he could be heard far away. The decided weight of the evidence is to this effect. It is scarcely conceivable that had he been sober he would have continued to "argue" when people had gathered about him so as to obstruct the streets and make of himself little else than a public nuisance.

Moreover, on the following morning, when conversing with another, an attorney came along and inquired, "Bill, I heard you were drunk last night?" The defendant responded: "So I heard." The attorney threatened: "I will give you forty-eight hours to resign, or I will go after you." Defendant resigned within two or three hours. Evidently defendant's answer was construed as an admission, and though not such, it is to be taken against him, for had the report been untrue, he would likely have denied it. Moreover, his resignation under the circumstances was in the nature of a confession. Possibly he thought to avoid trouble by "stepping down and out," and as the council reinstated him with practically no investigation as to whether he was drunk, there is room for the suspicion that this course may have been pursued with a view of avoiding proceedings for removal. This could have no such effect, however. *State v. Welsh,* 109 Iowa, 19. We have read and re-read the record in this case, and are unable to reach any other conclusion than that defendant was intoxicated. Undoubtedly resistance to the enforcement of the ordinance against automobile speeding by appealing from his judgments of conviction had irritated him. Ill feeling may have been aggravated by the suit for $15, paid under protest, for a license to conduct a chautauqua then in session, and he may have felt the sting of resentment of the many citizens he denounced as grafters or members of a Mabry gang (see *State v. Dobbins,* 152 Iowa, 632), but these do not explain his performance on the night in ques-

3. SAME: resignation: reappointment: removal.

tion, nor does his ordinary demeanor as a reputable man. He did drink whisky; he did try to get more, precisely as a drunken man would; he employed the language of intoxication, and those having the best opportunity to know pronounced him intoxicated. The trial court erred in dismissing the petition. The defendant should have been removed, and judgment of removal may be entered in this court, or the cause remanded for that purpose. *Reversed.*

All Justices concur.