STATE OF IOWA, Appellee, v. LESTER J. REYSA, Appellant.

**FALSE PRETENSES:** Elements—Obtaining False Signature to In-
1 strument. Principle reaffirmed that the offense of obtaining the signature to a promissory note by false pretenses is not consummated unless the accused not only obtains possession of the instrument, but also title thereto. Evidence reviewed, and held to justify the jury in finding that the offense was so consummated.

**FALSE PRETENSES:** Burden of Proof. Principle reaffirmed that the
2 State, on the trial of a prosecution for obtaining property by false pretenses, is under no obligation to prove each and every one of the representations alleged. Proof of one material representation and the falsity thereof is sufficient.

*Appeal from Fayette District Court.*—H. E. TAYLOR, Judge.

SEPTEMBER 20, 1924.

DEFENDANT Lester J. Reysa, Theo. Roy, and James La Vere were indicted under Section 5041 of the Code of 1897, upon the charge of designedly and by false pretense obtaining the signature of G. O. Smith to promissory notes. Defendant Reysa was tried separately, and found guilty as charged. From the judgment entered upon the verdict, he appeals.—*Affirmed.*

*G. P. Linville* and *R. S. Milner*, for appellant.

*Ben J. Gibson*, Attorney-general, *B. J. Flick* and *John Fletcher*, Assistant Attorney-generals, and *James D. Cooney*, County Attorney, for appellee.

ARTHUR, C. J.—I. The prosecuting witness, G. O. Smith, owned a 200-acre farm near Oelwein, Iowa, and lived in Oelwein. He had a wife and one boy, 18 years old, named LuVerne

> 1. FALSE PRE-
> TENSES: ele-
> ments: obtaining
> false signature
> to instrument.

Smith. Defendant was a stock salesman for the Atlas Wheel Company of Cleveland, Ohio. On May 26, 1921, G. O. Smith executed and delivered to defendant 22 notes in the total sum of $30,000. The indictment is based on this transaction. It charges that defendant designedly and by false pretense and with intent to defraud obtained the signature of G. O. Smith to said notes, the false making of which would be punished as forgery.

The ground for reversal most strongly urged is that the evidence fails to establish a case of cheating. Counsel for appellant do not concede that the evidence establishes a case of larceny, but argue that the only offense for which defendant could properly be indicted and tried in connection with the transactions involved is the crime of larceny. The determination of this question involves an examination of the evidence of events leading up to and connected with the transaction which is later set forth in substance.

Other errors are assigned on refusal to give a requested

instruction, attacking instructions given, and refusing to grant a new trial on the grounds that the verdict was contrary to instructions and contrary to the evidence, and to a ruling on evidence, and in submitting to the jury a certain alleged false representation.

II.  The evidence offered by the State in substance was that, about the latter part of March or the 1st of April, 1921, Reysa, under the alias of Ray Leslie, came to the home of Smith, representing himself as an agent of the Atlas Wheel Company, said company and its factory being located at Cleveland, Ohio, and that he was there to sell stock of said company; that Reysa solicited Smith to buy stock in said company; that Reysa stated that he came at the request of the company, in pursuance of a letter written to the company by Ben B. Little, of Oelwein, stating that he had seen quotations of the stock of the Atlas Company in a magazine, that the company had sent him to sell Little some stock and to sell to others, and that the capital stock of the Atlas Wheel Company was selling at $125 per share on the market; that Reysa stated that the company would like to have LuVerne become a stock salesman for them, and that he would have to own some stock before he could go to work; that, in a few days, Reysa again visited the Smith home, and then brought with him one Mr. Embree, and introduced Embree as an agent of the company who was working in the east and was on his vacation and came out to help him sell stock; that Reysa and Embree said the stock of the Atlas Company was worth $125 per share and was selling for that, and showed printed quotations; that Reysa stated that they wanted to sell some stock so as to enlarge the plant; that Reysa had with him a sample wheel and literature; that Reysa said that, before LuVerne could go to work, he would have to have some stock in the company; that Reysa and Embree came again to the Smith home the next morning, and wanted LuVerne to subscribe for stock; that Reysa said they wanted LuVerne to work for the company; that, at that time, Mrs. Smith, mother of LuVerne, subscribed for one share of stock; that on numerous occasions Reysa would contrive to meet Smith, and have along with him Roy and Embree, or one of them, or perhaps LaVere; that, at one of these con-

versations, Reysa and Roy met Smith in Oelwein, and Reysa was trying to sell stock to Smith, when Roy spoke up, saying, "I know a friend that has $40,000 worth of that stock, and it is good stock;" that Reysa then told Smith that Roy was a drainage contractor and engineer; that he had ditch contracts at Smithfield, Independence, and Waverly, and that he was there overseeing the three; that, at another time, when Reysa was soliciting Smith to buy stock and Roy was present, Roy said that he wanted to buy some stock and trade drainage warrants for it; that, at a later conversation between Smith and Reysa, when Roy was present, Roy said that he had bought stock from Reysa, trading drainage warrants in the amount of $25,000 for same; that, at another time, Reysa and Embree with him met Smith and took him into Reysa's room in the Mealey Hotel at Oelwein, and there represented to Smith that the stock was worth $125 a share, and that, if Smith's son, LuVerne, was to work for the company, he would have to have $5,000 worth of stock; that he showed Smith a letter from one Walker, in which Walker said that the boy would have to have $5,000 worth of stock. Smith refused to put up the $5,000. Reysa and Embree, not willing to drop the matter, further pursued Smith, Embree saying that he would carry a thousand in the name of LuVerne, and Reysa saying he would carry a thousand in the name of LuVerne, if Smith would put up the other $3,000. Thereupon, Smith executed and delivered to Reysa two notes, one for $1,400 and one for $1,500, which, with the $100 subscription made by the mother, made $3,000.

Smith testified further that, about ten days after the first talk he had with defendant, Reysa, wherein Reysa had stated that he came out to Oelwein to sell stock because of an inquiry made by Ben B. Little concerning the stock, Reysa told him that Little had then bought $10,000 worth of stock. In another conversation, Reysa said there was a man in Waterloo who wanted to purchase $20,000 worth of stock, and went into the factory and looked it over, and bought $20,000 worth of stock; that LuVerne was entitled to a commission on that stock; and that he would try to get the commission for him; that, at another time, Reysa and Roy, while driving to Independence, taking

Smith along with them, told Smith that Roy had a carload of tile at Independence, and wanted to see about unloading it; that, when they arrived at Independence, the codefendant, LaVere, appeared, and Reysa introduced LaVere to Smith as the freight agent of the Illinois Central Railway at Independence; that Reysa and LaVere, in Smith's presence, had some talk about the stock of the company, and LaVere stated that he owned $40,000 worth of stock and that he was going to buy $20,000 worth more, "because it was the only stock that ever made him a nickel."

It may be noted that the record shows without dispute that LeVere was not a freight agent, but was a stock salesman, working in conjunction with Reysa, and that Roy was not a drainage engineer, but a soap peddler, and did not have a contract with any county for the construction of ditches.

The record presents no serious dispute as to the representations made by Reysa to Smith to induce Smith to purchase stock in the company which he represented, and that some one or more material representations were untrue, and known by defendant to be false, and that Smith believed and relied upon said representations. We will not attempt to set forth all the representations testified to. A summary of the representations submitted by the court for consideration of the jury is as follows: That the capital stock of the Atlas Wheel Company was selling at $125 per share; that the United States government, the Ford Automobile Company, and the Essex Automobile Company then had orders with the company for a large number of wheels; that Ben B. Little, a resident of Oelwein, had written to the company, and Reysa had come to Oelwein and sold Little $12,000 worth of stock, and Little had paid him therefor; that Theodore Roy was a contractor and engineer of drainage projects in Fayette, Buchanan, and Bremer Counties, and had exchanged drainage warrants with the Atlas Wheel Company for $25,000 worth of stock in the company; that a judge of the district court and a lawyer of Cedar Rapids, Iowa, had visited the factory and inspected it and examined the books of the company, and had then purchased $50,000 worth of the stock; and that a woman living in Cedar Rapids, relying upon the investigation

and judgment of the judge and lawyer, had exchanged 300 acres of land near Cedar Rapids for stock.

Reysa was a witness in his own behalf. His version of his meetings with Smith and of their conversations is quite different from that testified to by Smith and his son, LuVerne. ·Reysa says that he met the son Luverne first, without prearrangement, and talked with him before he met G. O. Smith; that LuVerne saw the specimen of wheel that he had with him, and remarked that his father needed a wheel for his automobile, and wanted to know if Reysa would not arrange to show his father the wheel; that he told LuVerne that he would sell him stock of the Atlas Wheel Company, and that he would show the wheel to his father; . that, a day or two later, he was walking up a street in Oelwein, and his attention. was called, by the sounding of a horn, to an automobile standing in the street, and to someone in a car, motioning him to come to the car; that he approached, and was introduced by LuVerne Smith to his father, G. O. Smith; that Smith invited him to take a ride, and he did so; that, during the drive, Smith stated that his son had talked to him about the wheel, and said he would like to look at the wheel, and asked him to come up to his house that evening; that he went to the Smith home that evening and explained the wheel to Smith and his son and talked about stock in the company, and that he was selling stock of the company, but that he did not tell him that the stock was selling at $125 per share; that, about a week later, he visited Smith at his home and showed Smith some Atlas Wheel literature and explained the mechanical details of the wheel that was manufactured by the company; that Mr. Smith wanted to know if he could place his son in the factory; that he told him he did not know, but he would use his influence to that end; that nothing else was talked about, except that Smith stated that he would consider an investment in the company himself, and LuVerne said he had a $100 liberty bond, and asked his father's permission to invest that one share of stock, and his father gave him permission, and asked him to return in the morning and fix up the subscription; that, the following morning, Mr. Embree and he went to Smith's house, and Mrs. Smith subscribed for a share, and turned over to him a $100 liberty

bond; that, a few days later, Smith called on him at the hotel, and said he had decided to make a purchase of stock, and asked whether or not LuVerne was to be employed by the company; that he told Smith that he had called the company, and they were going to make arrangements to have LuVerne come to work, and asked him if he was ready for him at the factory, and he told Smith that, until the factory was ready for him, LuVerne could drive for him and take care of his car; that Smith then told him that he had decided to make an investment, and he asked him what amount he wished to make, and he said about $3,000, and Smith gave him two notes, one for $1,500 and one for $1,400, for 29 shares; that Smith said that he was figuring on taking additional stock later, and that he would make a larger investment; that LuVerne started to drive his car and study the literature of the company, and that he paid him $25 a week; that he frequently met Mr. Smith, but they had no conversation of any consequence until about the middle of May, when he met Mr. Smith and LuVerne; that they called at his hotel, and Smith told him he had decided to make an additional investment in a considerable amount, approximately $40,000; that Smith wanted him to take his farm in exchange for stock; that he told him he could not handle the farm, and that, if he wanted to sell the farm to make an investment, he could execute notes on long enough time to give him an opportunity to sell the farm, and Smith said that would be satisfactory; that he suggested to Smith that the amount of money he was figuring on investing was an unusual amount, and that it would be a good plan to investigate for himself; that he had better go to the factory with him and look over the Atlas Wheel plant; that Smith said he could not get away, and that he would send the boy to the factory to investigate; that, in pursuance of that conversation, he and the boy went to the factory, and returned about the 25th of May; that, on the morning of the 26th of May, Smith called on him at the hotel, and told him that the boy had explained to him all about the company, and he was satisfied with the report the boy had given him, and then and there Smith subscribed for $30,000 worth of stock and signed 22 notes, which, with what he had previously subscribed, aggregated $30,000.

Reysa denied making the representations testified to by G. O. Smith and LuVerne Smith.

A few minutes after Smith signed and delivered the 22 notes to Reysa, and at the same meeting, at the request of Reysa Smith signed the following memorandum, known as Exhibits 2 and 5 in the record:

"Oelwein, Iowa, May 26, 1921.

"I hereby authorize the bearer to purchase for my account three hundred (300) shares of the common stock of the Atlas Wheel Company of Cleveland, Ohio, paying therefor the sum of thirty thousand dollars.

"[Signed]   G. O. Smith"

Concerning Exhibit 2, Smith testified that the only talk about it was that Reysa said "that was to show that I had authorized him to buy stock and give the notes to pay for it." On rebuttal, Smith testified:

"At the time Exhibit 2 was delivered to me, the defendant said that receipt was to show I purchased $30,000 worth of stock in the Atlas Wheel Company."

On cross-examination during rebuttal, Smith further testified:

"Exhibits 2 and 5 were executed in the Mealey Hotel in defendant's room on the same day the 22 notes were executed. Exhibits 2 and 5 were signed three or four minutes after I signed the last one of the 22 notes. This was all part of the same transaction. * * * Exhibits 2 and 5 were executed before I left the room, after I signed the notes."

Smith testified that he understood that the proceeds of the notes he executed were to buy stock of the Atlas Wheel Company; that the money that the notes brought was to be applied to buy stock of the Atlas Wheel Company, either the notes or the money. Smith testified further that none of the notes were ever returned to him, except some that he paid and took up, and for which Reysa received the money.

III. At the conclusion of the evidence for the State, defendant moved the court, and afterwards renewed the motion at the close of all the evidence, to direct a verdict for the defendant, on the ground, among other things, that the evidence dis-

closed that Reysa became the agent of Smith for the purpose of disposing of the notes or the proceeds thereof, and hence title to and ownership of the notes never passed to defendant, and that, therefore, defendant could not be convicted of the offense charged in the indictment. The motions were overruled, and the question submitted to the jury as to whether title to and ownership of the notes passed to the defendant by virtue of the transaction of May 26, 1921. It is the position of appellant that the evidence failed to establish a case of cheating; that it appeared from the evidence that, if any crime was committed, it was not the offense of cheating by false pretenses, but that, if the evidence disclosed the commission of any crime, the offense was embezzlement or larceny by bailee, and not the offense charged in the indictment; that the evidence shows that the title to the notes never passed to Reysa, but that mere possession of the notes was given to Reysa, as shown by Exhibits 2 and 5; that by said exhibits Smith constituted Reysa his agent only to procure stock, and that the title to the notes remained in Smith.

The statute, Code Section 5041, under which the indictment was found, reads:

"If any person designedly and by false pretense, * * * and with intent to defraud, obtain * * * the signature of any person to any written instrument, the false making of which would be punished as forgery, he shall be imprisoned * * *"

As stated in *State v. La Vere,* 194 Iowa 1373:

"The material allegations of the charge are: (1) The design; (2) the false· pretense; (3) the intent to defraud; (4) the obtaining of the signature; and (5) the character of the written instrument as one the false making of which would be punishable as forgery."

Counsel for appellant urge that the offense committed, if any, as shown by the evidence, was not the offense defined by Code Section 5041, but was larceny or embezzlement; because in "cheating," the offense defined by Section 5041, the accused must not only obtain possession of, but must also obtain ownership and title to, the property involved, even though the title so obtained is voidable. The distinction drawn by counsel be-

tween the offenses mentioned is undoubtedly correct. *State v. Dobbins,* 152 Iowa 632; *State v. Loser,* 132 Iowa 419. It is also the rule that the intention and understanding of the prosecutor are the governing factor as to whether both title and possession, or possession only, pass under the transaction involved. *State v. Dobbins,* supra; *State v. Loser,* supra.

We think the evidence does not support the theory of counsel for appellant that, even though the evidence sufficiently established that there was a fraudulent design, carried out by false pretenses, with intent to defraud, culminating in obtaining the signature of Smith to the notes, still the crime of cheating was not made out, because Smith did not intend to part with the ownership of the notes in question, but merely the possession thereof. The intention and purpose of Smith, and also of the defendant, are to be determined from consideration of the conduct of the parties and all the facts and circumstances and from the nature of the transactions, as disclosed by the record. While the memorandum Exhibit 2, considered alone, might lend some support to the theory of appellant that Smith was appointing him as his agent to negotiate the notes and use the proceeds in purchasing stock, the record as a whole, we think, does not bear out such theory. Reysa presented himself to Smith as the agent of the Atlas Wheel Company, and solicited Smith to buy stock in said company. At the solicitation of Reysa, Smith subscribed for stock in the company, and executed and delivered his notes to Reysa, the agent of the company. Reysa took possession of the notes, and, according to Smith's testimony, kept them. No notes were returned to Smith, according to Smith's testimony, except canceled notes which he paid and took up. The evidence presented an issue to be determined by the jury. We think the evidence justified a finding that Smith intended to and did part with the title and ownership of the notes.

The gravamen of the crime charged was fraudulently inducing Smith to execute the notes in question. Whether possession of the notes was obtained by Reysa for his own benefit or for the benefit of another is immaterial, if Smith intended to part with the permanent possession and ownership of the notes. The criminality of the transaction of May 26th,—if the crime

charged was then committed,—was not altered by the execution of Exhibit 2 immediately succeeding the execution and delivery of the notes in question, nor by the subsequent transfer to Smith of some oil and gas leases in exchange for a portion of the notes. The court did not err in refusing to direct a verdict for defendant.

IV.    Appellant assigns as error the refusal of the court to give requested instruction reading as follows:

"If you find that, at the time the 22 notes were executed and delivered to defendant by G. O. Smith on May 26, 1921, the said G. O. Smith did not intend to part with the title and ownership of said notes, but on the contrary gave the same into the possession of the defendant for the purpose only of purchasing stock for G. O. Smith with said notes or the proceeds thereof, then the defendant must be acquitted."

In Paragraph 5, Subdivision F, of the instructions, the court properly imposed upon the State the burden of proving beyond a reasonable doubt, among other matters, "that, relying upon said representations which you may find were made by the defendant to G. O. Smith, the said G. O. Smith did deliver to defendant the said promissory notes, or some of them, with intent to then part with the possession, ownership, and control of said notes so delivered."    The jury was also instructed in Paragraph 8 that:

"If you find that, at the time the 22 notes were executed and delivered to defendant by G. O. Smith on May 26,. 1921, the said G. O. Smith did not intend to part with the title and ownership of said notes, then you will return a verdict of not guilty."

Appellant complains of the instruction given in said Paragraph 8 on the ground that said instruction was inadequate and incomplete, and no guide to the jury in determining the proposition involved therein.    We think the criticism not well founded. We observe no material difference in the proposition of law submitted in the requested instruction and the one given, and, reading Subdivision F of Paragraph 5, given by the court, in connection with Paragraph 8, we think the proposition was sufficiently stated.    We find no error at this point.

V. Defendant complains of refusal to grant a new trial on the ground that the verdict was contrary to the above quoted Paragraph 8 of the instructions. The gist of the complaint is that the evidence was not sufficient to support a finding that Smith intended to part with the ownership and title to the notes involved in the indictment. We have already considered and discussed this question. We find no error at this point.

VI. Appellant assigns error in permitting Smith to testify, over objections, that, at the time he signed the notes in question, he believed that "a judge of the district court and a lawyer of Cedar Rapids had gone to the factory," etc. 2. FALSE PRE- It is also contended that the court erred in submitting to the jury the claimed representations relative to the visit of the judge and lawyer to the plant. There was no error in the ruling, nor in submission of the representation,—at least no prejudicial error. Proper foundation for the question had been laid. It was not incumbent upon the State to prove each and all of the misrepresentations alleged. The proof of any one of them was sufficient, and the court so instructed the jury.

We find no reversible error in the case. The judgment of the trial court is affirmed.—*Affirmed.*

EVANS, PRESTON, and FAVILLE, JJ., concur.